[Crim. No. 9400.   Second Dist., Div. Four.   Oct. 21, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT LOUIS BUICE et al., Defendants and Appellants.

Miller & Malone, Loren Miller, Earl C. Broady and Stanley R. Malone, Jr., for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—At about 11 p. m. on April 27, 1962, Frank Tomlinson and Stanley Kensic, officers of the Los Angeles Police Department, were on routine patrol in the vicinity of 57th Street and Broadway in the City of Los Angeles. Both officers saw two Negro men (later identified as Monroe Jones and Fred Jingles) standing at the rear of a parked Buick automobile with its trunk open exhibiting clothing. Due to the high rate of burglaries in this area, the officers' suspicions were aroused when they saw two men in possession of a number of suits at that location at that hour of the night. The officers then pulled their vehicle in behind the parked car, got out of their car and observed that the trunk of the parked Buick contained a number of men's suits on hangers. The officers then inquired as to who owned the automobile and were told that it belonged to ''Brother Hardy over at the

Temple,'' with one of the men nodding toward the Muslim Temple located at 56th Street and Broadway.

The officers then separated the two suspects, with Officer Tomlinson taking his man to the rear of the Buick, while Officer Kensic took his suspect and started toward the front of the Buick for further interrogation. It was then that Officer Tomlinson observed some kind of scuffle between Officer Kensic and his suspect, whereby the suspect had pushed Officer Kensic. Officer Tomlinson then ordered his suspect to remain where he was and proceeded to give assistance to his partner. The suspect who had been left by Officer Tomlinson sprang upon Officer Kensic. When Officer Tomlinson tried to assist Officer Kensic, someone grabbed him and knocked him to the ground. Officer Kensic, then trying to aid Tomlinson, started to draw his revolver from its holster but was hit in the back of the head and knocked unconscious. However, before losing consciousness he remembered having his revolver taken away from him. At this point Officer Tomlinson recalled seeing eight to ten Negroes surrounding him and being beaten and kicked by these men. He also recalled hearing someone shout, ''Let's get them, Brothers,'' and ''Let's kill them, Brothers.''

While this affray was taking place, William Tribble, a special officer of the Los Angeles Police Department, who had been driving in this vicinity, noticed a struggle taking place between two uniformed police officers and a group of Negro men. One of the officers (Kensic) was lying in the intersection with men jumping up and down on him as well as kicking him. Tribble immediately parked his car, took out a .38 revolver, loaded it, and entered the scene of the struggle. Tribble identified himself as a special officer and called out, ''Leave these officers alone,'' and fired one shot in the air. The group of Negroes then removed their attention from the officers and advanced on Tribble. As the group continued to advance upon him, he warned the group to stop or he would shoot. The group, not heeding Tribble's admonition, Tribble, at this time, being backed up against his car, fired a shot, hitting one of his assailants.[1] Some more shots were then fired, with one of them striking him in the arm, and he also saw Officer Tomlinson grab his shoulder and fall. The shot that hit Officer Tomlinson went through the tip of

---

[1]DeWayne Wolper, a police officer, and an acknowledged expert, testified that the bullet lodged in Roosevelt Walker, one of the defendants, came from Tribble's gun.

his elbow, breaking his arm. Officer Tomlinson identified defendant Charles Zeno as one of the men who was striking him.

Officer Kensic, who had been knocked unconscious at the front of the Buick, returned to consciousness after a few minutes. He recalled hearing some chanting by the Negroes as well as shots going off. He got to his feet and went after a man he suspected was the person who might have taken his gun. He caught that man and began to search him for his gun. Suddenly he was struck in the face, beaten, kicked and again rendered unconscious. Officer Kensic was able to identify Robert Buice as the man who struck him in the face and forced him to the pavement.

Another officer who participated in this portion of the affray was off-duty officer Paul Kuykendall. Officer Kuykendall testified that he was driving on Broadway when he observed a crowd of eight to ten men striking and kicking a police officer at the intersection of Broadway and 57th Street. The officer being beaten was Kensic. He then put in a call, "Officer needs help." Kuykendall then ran to the aid of Kensic, who was lying in the intersection being beaten and kicked. Officer Kuykendall then admonished Kensic's assailants to "Stop kicking him [Kensic] or I will kill you." Kensic's assailants then turned their attention to Kuykendall who went immediately to the radio telephone in the police vehicle and put in a call for police assistance.

Within 30 seconds or so Officers Weese and Anderson responded to the call. Upon their arrival Officer Kuykendall pointed out the men who had been beating Officer Kensic. By this time these men had turned and were running in the direction of the Muslim Temple or Mosque at 56th Street and Broadway. Officers Anderson, Weese and Kuykendall took after these men. When Kuykendall was in the vicinity of the Temple he saw defendant Arthur Coleman struggling with an officer named Lee Logan over possession of a gun. He struck Coleman over the head with his blackjack. However, when Coleman was subdued defendant Jingles joined this affray and made a flying tackle on Officer Logan.

Meanwhile, Officers Anderson and Weese pursued the men they had been chasing to the door of the Temple. Officer Anderson grabbed one of the men and ordered the rest to "Stop where you are." At this point about 10 to 12 men came out of the Temple building, surrounded Officer Weese, and began chanting "Why, why." Officer Weese, with gun

drawn, ordered the men to "freeze." It was then that someone struck Officer Weese, his baton was taken from him, and he was beaten with it. Officer Anderson was kicked and felt his gun being taken from its holster and was then struck in the head by what he thought was the glass neck of a 5-gallon water bottle. Officer Weese, able to free himself with the aid of Officer Logan, responded to the aid of his partner. He fired three or four shots in quick succession as the attack continued. As a result, one man was killed (Ronald Stokes) and another had his spine severed (William Rogers).

When the altercation outside the Temple was just about over, Officer Weese saw Officer Anderson lying on the sidewalk in a rather dazed condition. Blood was running down his forehead and one of his attackers was still choking him. Officer Weese went over and hit the attacker on the head with the barrel of his gun and the man collapsed to the sidewalk unconscious.

During this wild melee, Officer Anderson was able to identify Elmer Craft, Robert Buice, Monroe Jones and Nathaniel Rivers. Officer Weese was able to identify William Rogers as the man who was wielding the baton and striking Officer Anderson, Robert Rogers as the one who struck Anderson with the neck of the water bottle, Arthur Coleman as the man who had jumped on his back, and Ronald Stokes as the man who was killed when he advanced against Weese in a "choking motion."

About 30 or 40 seconds after this altercation outside the Temple had ended, Officer Weese entered the Temple with another officer. Once inside he observed that a large group of men were huddled together in a cloakroom. At the instance of the other officer ordering the men to raise their hands and face the wall, another police officer (Reynolds) crawled out from the huddle of men. Officer Weese identified three of the men inside the Temple as Randolph Sidle, Charles Zeno and Raymond Willey, although he did not observe them doing anything.

Officer Logan, in part, corroborated the testimony of Officer Weese in that he saw Officer Weese being choked and in defense of Officer Weese struck the man with his gun barrel and went to the aid of Officer Anderson, who was being beaten by a man wielding a baton. As he did so, another man struck him in the mouth with a baton and split his lip. He then fired two shots at this man, and when another assailant attempted to grab his gun, he shot the man in the chest.

During this melee, he was assisted by Officer Kuykendall and Officer Logan. Officer Logan testified that the man hitting Officer Anderson with the baton was Robert Rogers, and the man who grabbed his gun and who was shot was Arthur Coleman.

Officer Reynolds testified that he responded to a radio call, and arrived at the Muslim Temple. He observed some officers engaged in a struggle with a group of men in front of the Muslim Temple. Upon seeing some of the men enter the Temple, he followed them in. Once inside, he was grabbed by a number of men who said, "Get him," then he heard some more words to the effect "Kill him," "Take him in this room here." He was then forced into a cloakroom, where he fell against a water jar causing it to fall to the floor and break. After being forced into the cloakroom, he heard some officer say "Get up out of there or I'm going to start shooting." His assailants then released him, and as he crawled out of this group of attackers he observed that there were several officers holding the group at bay with drawn pistols.

Officer Reynolds was able to identify Troy Augustine, Raymond Willey, Nathaniel Powers, Robert Buice, Randolph Sidle, Charles Zeno, Arthur Coleman, Jr., and Elmer Craft as the men who had forced him into the cloakroom.

Officer R. P. Williams testified that, in response to a radio call, he went to the Muslin Temple with his partner, Officer Reynolds. He and Reynolds went inside the Temple when Reynolds immediately became entangled with some men, and during the struggle a water bottle fell and broke. In the Temple he was able to identify Elmer Craft, Robert Buice, Nathaniel Rivers, Randolph Sidle, Troy Augustine and Raymond Willey.

Other officers present at the scene of the struggle on this ill-fated night were Edward Ryan and Raymond Plante. Both Ryan and Plante arrived at the scene of the struggle when the affray was well underway. Upon their arrival they saw four or five police officers lying on the sidewalk, one officer was on the curb in a dazed state, and a number of men were inside the Temple. Officer Ryan saw Fred Jingles strike one of the officers, and when he pulled Jingles off the officer, Jingles bit him on the inside of his leg. In order to subdue Jingles, he struck him and handcuffed him. Officer Ryan also saw Officer Anderson standing near the Temple door, bleeding from the head, dazed and staggering. Officer

Plante found Roosevelt Walker bleeding from a gunshot wound.

Officer Bielman, when he arrived at the scene, saw glass on the sidewalk, put it in a box; saw Jingles jump on Officer Logan's back; got into the scuffle and was knocked unconscious. Officer Gibson testified that he found a gun (later identified as the gun belonging to Officer Kensic) in a storm drain at the corner of 57th Street and Broadway in the early morning hours of April 28, 1962. All the cartridges in the gun were spent.

As a result of the incident of April 27, 1962, and after a preliminary hearing on December 18, 1962, the District Attorney of Los Angeles County filed an information consisting of 12 counts against 14 defendants.[2] Due to the complexity of the case and the fact that not all counts are lodged against all of the defendants, it is necessary both for a better understanding and to clarify the status of the record, to set forth each of the charges made against each of the 14 defendants, and the disposition made of each charge against each of the defendants.

Count I charged all 14 defendants with violation of Penal Code, section 69, in that said defendants "did knowingly resist, by the use of force and violence, executive officers in the performance of said officers' duties."

Count II charged defendants Louis Buice, Monroe Jones, John Henry Morris and Roosevelt Walker with violation of Penal Code, section 245, subdivision (b), assault with force upon Police Officer Stanley Kensic.

Count III charged defendants Monroe Jones and Charles Zeno with violation of Penal Code, section 245, subdivision (b), assault with force upon Police Officer Frank Tomlinson.

Counts IV and V respectively charged that John Henry Morris did wilfully, unlawfully and feloniously assault Frank Tomlinson, a peace officer, and William Tribble, a human being, by means of force likely to produce great bodily injury with intent to commit murder, in violation of Penal Code, section 217.

Count VI charged defendants Louis Buice, Arthur Coleman, Elmer Craft, Monroe Jones, Robert Rogers, William Rogers and Nathaniel Rivers with violation of Penal Code,

---

[2]Those named in the information are: Troy Augustine, Louis Buice, Arthur Coleman, Elmer Craft, Fred Jingles, Monroe Jones, John Henry Morris, Nathaniel Rivers, Robert Rogers, William Rogers, Randolph Sidle, Roosevelt Walker, Raymond Willey and Charles Zeno.

section 245, subdivision (b), assault with force upon Police Officer Richard Anderson.

Count VII charged that Arthur Coleman did wilfully, unlawfully and feloniously assault Donald Weese, a police officer, in violation of Penal Code, section 217.

Count VIII charged Arthur Coleman and Robert Rogers with violation of Penal Code, section 245, subdivision (b), assault on Police Officer Lee Logan.

Counts IX, X and XI respectively charged Fred Jingles with violations of Penal Code, section 245, subdivision (b), assaults by means of force on Police Officers Lee Logan, Frank Bielman and Edward Ryan.

Count XII charged defendants Louis Buice, Elmer Craft, Charles Zeno, Troy Augustine, Nathaniel Rivers, Randolph Sidle and Raymond Willey with violations of section 245, subdivision (b), of the Penal Code, assault by means of force on Police Officer Robert Reynolds.

The information also alleged that Rivers, Buice and Sidle had suffered prior felony convictions, which were subsequently admitted as being true.

After denial of defendants' motion to have counts of the information set aside, and after the overruling of their demurrer to count I of the information, the cause came to trial on April 8, 1963. On June 14, 1963, verdicts were returned. John Henry Morris and Raymond Willey were found not guilty on all the charges lodged against them. Upon the jury's being unable to reach a verdict as to Augustine on count I, Jingles as to count XI, Jones as to counts II and III, and William Rogers as to count VI, mistrials were declared, and upon motion of the People these counts were dismissed in the interests of justice. Thus, with the exception of Morris, Willey and Augustine, the remaining 11 defendants were all found guilty on count I, violation of Penal Code, section 69.

Additionally, Buice was found guilty of simple assault, defined by the court as a lesser but necessarily included offense to that charged in counts II and VI. Coleman was found guilty of violating section 245, subdivision (b), as charged in counts VI, VII and VIII. Craft was also found guilty of simple assault, defined by the court as a lesser but necessarily included offense to that charged in count VI of the information. Jingles was found guilty of violation of section 245, subdivision (b), as charged in count IX, and simple assault, a lesser but necessarily included offense to the one charged

in count X. Rivers was found guilty of simple assault, a lesser but necessarily included offense to that charged in count VI. Robert Rogers was convicted of violation of section 245, subdivision (b), as stated in counts VI and VII of the information.

In summary, the jury returned not guilty verdicts as to two (Morris and Willey) of the 14 defendants and another (William Rogers) was entirely freed when the jury failed to agree in his case. The remaining 11 defendants were all convicted of violating section 69; and five of these defendants, Zeno, Jones, Walker, William Rogers and Sidle, on this charge alone.[3] This appeal followed.

## I

■ Throughout the long history of this case, defendants have repeatedly attacked section 69[4] as being inapplicable. Defendants, by tracing the history of the enactment of Penal Code, section 69, attempt to show that its purpose is solely to punish a person who interferes with an officer serving court process, and is not a statute intended to punish a person for interference with a police officer in the performance of his duties. Defendants contend that the applicable statute for that purpose is section 148 of the Penal Code.[5] This argument must fail for two reasons. ■ First, section 69 is distinguishable from section 148 only in that section 148 is more general in terms and applies to interference with or obstruction of *any public officer* in the discharge of his duties; while section 69 is limited solely to *executive officers*. (*Manss v. Superior Court* (1914) 25 Cal.App. 533, 535 [144 P. 298].)

■ Furthermore the term "executive officer" has long been held to include police officers. (See *People* v. *Markham* (1883) 64 Cal. 157 [30 P. 620, 49 Am.Rep. 700]; *Harris* v.

---

[3]We set out in an appendix the persons charged in each count and the various dispositions.

[4]Section 69 reads: "Every person who attempts, by means of any threat or violence, to deter or prevent an *executive officer* from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding five thousand dollars, or by imprisonment in the state prison not exceeding five years or in a county jail not exceeding one year, or by both such fine and imprisonment." (Italics added.)

[5]Section 148 provides: "Every person who wilfully resists, delays, or obstructs *any public officer*, in the discharge or attempt to discharge any duty of his office, when no other punishment is prescribed, is punishable by a fine not exceeding one thousand dollars, or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment." (Italics added.)

*Superior Court* (1921) 51 Cal.App. 15 [196 P. 895] ; *People* v. *Mathews* (1954) 124 Cal.App.2d 67 [268 P.2d 29].)

Secondly, defendants' position that section 69 was directed only against interference with an officer serving a writ or other process of court and that interference with the police in the performance of their duties is punishable under a different statute fails to take into consideration that interference with the court's process is a contempt of the court's power. Such conduct is already expressly made unlawful by Penal Code, section 166, subdivision 5, which states that to wilfully resist the lawful process of any court constitutes a contempt of that court. (See *Smith* v. *Smith* (1953) 120 Cal.App.2d 474 [261 P.2d 567].)

Thus, section 69 is designed to protect a police officer (who is an executive officer) against violent interference with the performance of his duties, rather than interference with court process which is covered in section 166, subdivision 5.

Defendants' next attack on section 69 is that it is unconstitutional for vagueness when applied to the instant case. Defendants point out that the most striking thing about the language of section 69 is that it denounces conduct toward ''an executive officer'' without any limitation of language in that it does not specify the offense as one against an *executive officer of this state.* Since the term ''executive officer,'' standing alone, is not definitive—because it comprehends persons who are executive officers of corporations, partnerships, business institutions, military units, and persons who occupy executive positions in local, state or federal governments stationed here—they argue that a man of ordinary prudence and understanding may be left to hazard a guess as to the statutory meaning or the trial court may be left to surmise as to whether the conduct of the accused is interdicted.

Generally, the meaning of a statute must be definite and certain for it to be valid, and this is particularly true of penal statutes defining offenses or prohibiting certain conduct. This is so in order to inform those subject thereto what is required of them. (*Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481 [171 P.2d 21, 166 A.L.R. 701] ; *Pacific Coast Dairy* v. *Police Court* (1932) 214 Cal. 668 [8 P.2d 140, 80 A.L.R. 1217].) By the same token, however, all that is required pertaining to certainty is that the statute be reasonably certain and in accordance with the apparent purpose and intention of the Legislature. (*County of Alameda* v. *Kuchel* (1948) 32 Cal.2d 193 [195 P.2d 17].)

■ As pointed out heretofore, the term "executive officer" has long been interpreted as including local police officers. ■ In addition, we can see no ambiguity insofar as appellants are concerned. If there be any ambiguity in the section (and we do not imply that there is) it relates to the inclusion or exclusion of executive officers of entities other than the state. Since the police officers herein involved clearly were within the group protected by the statute, these appellants cannot be heard to urge that they do not know how many other kinds of executives might also be protected.

## II

■ Defendants' next contention is that their constitutional right was violated when the public prosecutors, by the use of the peremptory challenge (Pen. Code, § 1069) systematically excluded all Negroes and persons with Spanish surnames from the trial jury. It is the defendants' position that, by use of the peremptory challenge in this manner, the prosecution was able to accomplish by indirection that which the jury commissioner is forbidden to do by the equal protection clause of the Fourteenth Amendment. (See *Norris* v. *Alabama* (1935) 294 U.S. 587 [55 S.Ct. 579, 79 L.Ed. 1074].)[6]

The contention does not appear to have been passed on in this state, nor are we cited to any decision of the Supreme Court of the United States directly in point. However, those authorities which have ruled directly on defendants' contention have refused to find any violation of a constitutional right.

In *People* v. *Roxborough* (1943) 307 Mich. 575 [12 N.W. 2d 466], the court said: "The reason counsel may have for exercising peremptory challenges is immaterial. This right has been granted by law, and it may be exercised in any manner deemed expedient, and such action does not violate any of the constitutional rights of an accused. If [defendant's] argument is carried to its logical conclusion, it would do away with the basic attribute of the peremptory challenge because, if such argument is accepted in all cases involving defendants of the Negro race, the prosecutor, upon challenging prospective jurors of that race, would either have to assign a cause for such challenge or take the risk of a new trial being granted on the ground that he discriminated

---

[6]It should be noted that no claim is made that defendants' constitutional right in the selection of the jury panel was violated.

because of color; as a result, no one could safely peremptorily challenge a juror where the defendant was of the same race as the juror. This right claimed by [defendant], would extend to members of his race a privilege that is not granted to any other race or class. It is apparent, therefore, that [defendant's] position is untenable.'"[7]

However, we need not decide the constitutional issue thus urged on us for the reason that defendants have not presented facts showing that such discriminatory challenges were, in fact, utilized by the prosecution in the instant case.

While the *voir dire* of the jury panel was still pending, defendants' attorneys filed with the trial court a motion asking the judge to dismiss the trial jurors theretofore selected and to order empanelment of a new jury panel or in the alternative to grant defendants 80 additional peremptory challenges. The basis for the motion was that the prosecutor was wilfully and systematically excluding all Negroes and all persons of Negro descent from serving or sitting as trial jurors in violation of the Fourteenth Amendment. The initial supplemental declaration of Loren Miller then listed the names of 10 Negroes who were qualified as jurors but who had been subjected to peremptory challenges by the People.[8]

In counterdeclarations, Evan W. Lewis and Harold Kippen, Deputy District Attorneys assigned to try this case, stated that "no person who has been challenged by the prosecution through affiants were challenged solely on the basis of race, color or creed. All peremptory challenges made by affiants were made pursuant to section 1069 of the Penal Code, and constituted a conscientious effort to obtain an impartial jury so that the matter could properly be tried with fairness to defendants and the People of the State of California."

Defendants' attorneys later filed a supplemental declaration listing the names of four additional persons who were Negro and who were excluded by the People by the use of the peremptory challenge. As the selection of the jury drew to a close, the names of four other Negroes who had been excluded by the use of the peremptory challenge by the People were read into the record.

---

[7]Consult, also, the cases collected in 4 A.L.R.2d 1200, "Use of peremptory challenge to exclude from jury persons belonging to a race or class."

[8]Mr. Miller's declaration states that Walter S. Brown was excused by the People; however, the reporter's transcript clearly indicates that the defendants excused Mr. Brown themselves.

The record discloses that, at the time defendants' attorneys filed their initial declarations, the People had exercised 63 peremptory challenges. At that point only 12 Negroes had been called to the jury box.[9] The record further discloses that, of these 12, one of the Negro jurors was challenged for cause, one was excused by defendants themselves, and at least one was excused by the court because the estimated length of trial would greatly inconvenience and impose a hardship on him. We have read the entire proceedings on *voir dire* and have found no tangible evidence that any of the jurors who were called to the jury box were excused by the People solely on the basis of race, color or creed. By the same token, no evidence appears in the record to dispute the deputy district attorneys' declaration that their use of the peremptory challenge was used for any purpose other than the exercise of a conscientious effort to obtain a fair and impartial jury. In fact, in almost every case of challenge the *voir dire* had disclosed facts about the prospective juror, not involving his race as such, which clearly suggest the reason why an experienced trial counsel would have felt inclined to exercise his right of peremptory challenge. Based upon the record before us, defendants have failed to make the factual showing requisite to the raising of a constitutional issue.

### III

Defendants next charge that count I of the information, violation of section 69, was a scatter-gun affair and did not give each of them adequate notice of the offense with which he was charged. It is defendants' contention that there were multiple offenses and multiple victims and that each defendant should have been given notice with specificity of the particular offense with which he was charged.

By operation of Penal Code section 31, "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." And by the express terms of Penal Code section 971 ". . . all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals

---

[9]Although Mr. Miller's initial supplemental declaration lists the names of only 10 Negroes, our search of the record in conjunction with this declaration discloses that 12 Negroes were called to the jury box.

and no other facts need be alleged in any accusatory pleading against any such person than are required in an accusatory pleading against a principal.''

Furthermore, with regard to section 31, it has long been settled that one may aid and abet in the commission of a crime without having previously entered into a conspiracy to commit it, so long as it is clear from the circumstances that their purpose was to assist each other in its accomplishment. (*People* v. *Fleming* (1961) 191 Cal.App.2d 163 [12 Cal.Rptr. 530]; *People* v. *Grischott* (1951) 107 Cal.App.2d 631 [237 P.2d 712].)

The People's case clearly showed that all the defendants herein involved participated in a continuous transaction of insurrection against the authority of the police, preventing the police officers from performing their duties. The evidence also shows that assistance was rendered by each defendant on behalf of the others to aid and abet in the violence against police officers in the performance of their duties. Under these circumstances the evidence paints a clear picture of common guilt. There is no question that the evidence sufficiently shows that these defendants did aid and abet one another. Each defendant was therefore a principal in each offense against each police officer named in count I. Under these circumstances the sufficiency of count I cannot be questioned.

IV

Defendants claim that the court erred in not giving their requested instruction that they had a right to defend their Mosque (Temple) against the riotous invasion by the police officers. The defendants contend that the evidence was that the officers unlawfully burst into their Mosque, sweeping everything and everybody before them, and therefore they had the right to defend against such unlawful intrusion. All the evidence in the record, however, is contrary to this position.

It will be recalled that, when the violence against the police officers began at 57th Street, the men attacking the officers were interrupted by the arrival of other police. The attackers then ran or retreated to the Muslim Temple at 56th Street, with Police Officers Kuykendall, Anderson and Weese in pursuit. The violence against the police officers then continued at the Temple. Every attempt upon the part of the officers to take defendants into custody provoked more violence. This continuous transaction of insurrection against the authority of the police was then carried into the Temple

itself due to the defendants' further attempts to escape arrest for the criminal assaults upon the police officers. Therefore, it was necessary for the arresting officers to enter the Temple in order to prevent the escape and to effectuate the arrests of defendants. With this status of the record, defendants' position that they were defending against an unlawful invasion is wholly devoid of merit, and the proffered instruction was properly refused.

## V

The People, after having presented their evidence bearing directly on the commission of the offenses charged in the information, then offered evidence of an affair which was alleged to have taken place at the University of California at Los Angeles on April 23, 1962, in which some members of the Muslim faith were said to have become embroiled with campus police officers over the sale of the newspaper "Muhammed Speaks." While the evidence as to this incident is sharply in conflict, the People's version, in summary, discloses that defendants Morris, Walker, Jones, Craft and Coleman went to the university to sell newspapers and became involved in a quarrel with campus police officers during which there were uttered such sentiments as "Let's kill the police," "What better place to die," "Let's take them here." No arrests were made.

The trial court, in allowing testimony of this incident, was of the opinion that it had a direct bearing on the present trial because expressions were used similar to those used on the night of April 27, and this would indicate a state of mind which would be pertinent to the events which occurred on the night of April 27.

Defendants now contend that their trial being already charged with emotion due to the unpopularity of the Muslim doctrine and belief, the intrusion of the university incident could serve no other purpose than to color the proceedings and prejudice the jury against the defendants, thus denying them their guaranty to a fair and impartial trial.

The law is well established that evidence of other offenses and acts is admissible to show, among other things, criminal intent, knowledge or motive. (*People* v. *Hatch* (1912) 163 Cal. 368, 378-379 [125 P. 907] ; *People* v. *Gray* (1884) 66 Cal. 271, 274-276 [5 P. 240] ; Witkin, Cal. Evidence, 160-161.) As previously indicated, the court allowed this evidence for the sole purpose of showing the state of mind, intent and

motive of certain defendants who were supposedly present at this incident, and the jury was so instructed.[10]

Clearly, the purpose of introducing the university incident was to demonstrate the fact that certain of the defendants named in the information, and allegedly present at the university incident, demonstrated a contemptuous attitude for the authority of law enforcement officers, which attitude was carried over to the sequence of events occurring on the night of April 27. Furthermore, the university incident was very close in point of time, occurring only four days before. We find no error in the admission of such evidence.

## VI

Defendants also contend that, while the court did instruct the jury in the words of Penal Code section 69,[11] it erred in failing to instruct the jury as to the components of the crime proscribed by that section. Therefore, the jurors were left entirely free to speculate and to determine for themselves what a police officer's "duty" was in the context of the situation of April 27.

It is well settled that an instruction in the language of the statute is entirely proper if the jury would have no difficulty in understanding the statute without guidance from the court. (*People* v. *Thomas* (1945) 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Albertson* (1944) 23 Cal.2d 550 [145 P.2d 7].)

Such is the case here. The duties of a police officer are common knowledge and need no special interpretation.

---

[10]The instruction given reads as follows: "Evidence relating to the incident at the University of California, at Los Angeles campus on April 23, 1962, was received for a limited purpose only: for such bearing, if any, as it might have on the question whether any defendant named in such testimony is innocent or guilty of any crime charged against him in this action.

"You are not permitted to consider that evidence for any other purpose, and as to that purpose you must weigh such evidence as you do all other in the case.

"The value, if any, of such evidence depends on whether or not it tends to show—

"(1) That a defendant had a motive for the commission of an offense charged against him in this action; or (2) that a defendant entertained the intent which is a necessary element of the alleged crime for which he is now on trial; or (3) that in regard to the defense of self-defense as defined for you in my instructions, as to which party was the aggressor."

[11]The actual instruction given by the court reads: "Every person who knowingly resists by the use of force or violence an executive officer in the performance of such officer's duty is guilty of a crime.

"'Executive officer' .as used in this instruction includes a duly appointed and acting member of the Police Department of the City of Los Angeles."

Therefore, we find no error with the instruction as given by the court.

## VII

As will be recalled, defendants Roosevelt Walker, Charles Zeno, Monroe Jones and John Henry Morris were all charged in separate counts with violations of Penal Code section 245, subdivision (b), assault likely to produce great bodily injury to a peace officer. Each of these defendants was found "not guilty" of these charges. Defendant William Rogers was similarly charged, but the jury was unable to agree and mistrial was declared. These same defendants were all found guilty, however, on count I, violation of section 69. Defendants concede that inconsistent verdicts of this nature do not require a holding that the conviction is a nullity, but rather argue that all that was left after subtraction of these not guilty verdicts is just a surmise or suspicion, based on defendants' presence at the scene and some injuries to the officers involved, that they had interfered with police officers in the performance of their duties. Therefore, the evidence is wholly insufficient to justify the verdict as to count I. It should be noted, however, that defendants arrive at this ingenious conclusion by resolving all the conflicts in the evidence in their favor.

The difference between the charge in Penal Code section 69 and Penal Code section 245, subdivision (b), is immediately apparent. It takes little imagination to conceive of a situation where one can be guilty of interference with a police officer in the performance of his duty without actually being guilty of an assault upon an officer with force likely to produce bodily injury. Since defendants were found guilty on count I, a very brief sketch of the evidence, stated in the light most favorable to the People (*People* v. *Sweeney* (1960) 55 Cal.2d 27 [9 Cal.Rptr. 793, 357 P.2d 1049]), will dispel any notion of the insufficiency of the evidence to justify the verdict as to count I.

Defendant Walker was shot by Special Officer Tribble at 57th and Broadway, where Officers Kensic and Tomlinson were being viciously beaten. When questioned by the police, Walker stated that he was shot while fighting a policeman. Defendant Zeno was identified by Officer Reynolds as one of the men who had forced him into the cloakroom inside the Temple. Officer Weese also identified Zeno as one of the group that was inside the Temple. Officer Anderson identified defendant Jones as

the leader of the group that had run from 57th Street up to the Muslim Temple, and he was the person whom Officer Anderson grabbed just as he was entering the Temple. In the struggle just outside the Temple, Officer Weese identified Jones as the man he saw seize Officer Anderson and choke him. Officer Weese stated that Jones was the man he shot in the left shoulder. Defendant William Rogers was identified by Officer Weese as the man who came from the Temple with a glass bottle and smashed it over the head of Officer Anderson.

In light of the foregoing, we find no merit with the contention of these particular defendants that having been acquitted of assault under Penal Code section 245, subdivision (b), or as to William Rogers, that charge having been dismissed after a hung jury, the evidence was insufficient to support the verdict against them on count I.

## VIII

Finally, defendants argue that the evidence is insufficient to support judgments of conviction on the remaining counts. We cannot agree.

In quick summation, Robert Buice was found guilty on two counts of simple assault and one count of violation of section 69. One of the assault convictions (count II) was based on Buice's alleged attack on Officer Kensic. Officer Kensic identified Buice as the man who struck him in the face at the intersection of 57th Street and Broadway. When other men jumped on Officer Kensic, it was Buice who forced Officer Kensic to the pavement.

In count VI defendants Buice, Craft, Rivers, Coleman, Robert Rogers, William Rogers and Jones were charged with violation of Penal Code section 245, subdivision (b), assault with force upon Police Officer Richard Anderson. Jones was found not guilty and a mistrial was declared as to · William Rogers. Buice, Craft and Rivers were found guilty of simple assault (an included offense), while Coleman and Robert Rogers were found guilty as charged in count VI. Here, too, the evidence is sufficient to support the judgments of conviction. Officer Weese was able to identify Robert Rogers as the man who was striking Officer Anderson over the head with his own baton and the person who struck Officer Anderson with the broken top of a 5-gallon water bottle. Coleman was observed as attacking and choking Officer Anderson. Officer Logan also identified Robert Rogers as the person hitting Officer Anderson with the baton. Officer Anderson was also able to identify Craft as one of the

men who had been chanting in front of the Temple and as one of the men who had his hands on him as he was being forced to the ground. Rivers was identified by Anderson as one of the men who were in the group at the Temple and who had attempted to kick him. Officer Weese corroborated this testimony. Buice was identified as running from 57th Street to the Temple and was observed among the group at the Temple who were attacking Officers Weese and Anderson in front of the Temple. ·

Coleman was also found guilty of forceful assault upon Officer Donald Weese as charged in count VII. Officer Weese testified that he saw Coleman attacking his partner, Officer Anderson, and in attempting to rescue Anderson Coleman turned his attack to him, and thus Weese was forced to shoot Coleman.

In count VIII Coleman and Robert Rogers were convicted of forceful assault upon Officer Logan. Likewise, the evidence here is sufficient to support the judgments of conviction. Officer Logan testified that it was Robert Rogers who was wielding a baton and who had struck him in the face with it, while Coleman was the man who grabbed for his gun and was striking out and kicking.

Defendant Jingles was convicted of forceful assault upon Officer Logan as charged in count IX, and simple assault on Officer Bielman, a lesser included offense to the one charged in count X. Officer Logan testified that when he attempted to aid Officer Anderson he was tackled and thrown to the ground by defendant Jingles. This event was corroborated by Officer Bielman who testified that he was present when Jingles jumped on Officer Logan's back and struck Officer Logan. When Officer Bielman went to Officer Logan's aid Jingles then turned and began to strike him.

In passing, it should be stressed that, while some of these defendants were not in fact armed with a weapon other than their fists, it is thoroughly settled that an assault by means of force likely to produce great bodily injury may be made by the use of hands or fists (*People* v. *Bumbaugh* (1941) 48 Cal.App.2d 791 [120 P.2d 703]); and the kind of assault likely to produce great bodily injury is generally a question of fact for the jury. (*People* v. *Nudo* (1940) 38 Cal.App.2d 381 [101 P.2d 162].) The jury in this case made that determination. We see no error.

Furthermore, at the defendants' request the court gave instructions on included offenses, and the jury found

certain defendants guilty on certain of the counts of simple assault. Such is a necessarily included offense within the charge of force likely to produce great bodily harm. (*People v. Brooks* (1942) 50 Cal.App.2d 610 [123 P.2d 556]; *People v. Alderson* (1930) 105 Cal.App. 202 [287 P. 362].)

Furthermore, even though certain of the defendants were charged with actual violence upon certain named officers, it was not required that the evidence necessarily show that each defendant did each act, if in fact each of them participated by aiding and abetting in the commission of the acts. (Pen. Code, § 31; *People v. Bundte* (1948) 87 Cal.App.2d 735 [197 P.2d 823].)

The jury deliberations occupied a period of 24 days (from May 21 through June 14). On June 10th, the jury returned with verdicts on some counts against some defendants. Thereafter they deliberated for an additional four days, returning their final verdicts at 5:18 p.m. on the 14th of June. As we have set forth, the verdicts acquitted two defendants entirely, acquitted 10 of the remaining 12 on some counts, disagreed as to 4 defendants on some counts, and returned verdicts of guilty of lesser offenses in four instances. It is clear that the jury not only took its duties seriously, but exercised a careful and conscientious discrimination in weighing the evidence as to each defendant on each count. The contention that the jury was influenced by bias or prejudice is convincingly refuted, even if we regard that claim as otherwise valid.

## IX

Although not raised by defendants, one further point appears from the record and compels our consideration.

As we have pointed out above, the theory on which all defendants were convicted under section 69 was that all of them had joined in a single operation to interfere with the police officers and to inflict injuries on them. It follows that all of the offenses charged were part of a single transaction and that section 654 of the Penal Code prohibits the imposition of double sentences, although not of double convictions. (*People v. McFarland* (1962) 58 Cal.2d 748, 762-763 [26 Cal.Rptr. 473, 376 P.2d 449].)[12]

---

[12]We recognize that, in some cases, a defendant can be both convicted and sentenced for crimes committed against different victims, although both crimes were committed in the course of a single episode. However, as our review of the evidence discloses, it is here impossible to segregate the assault on any one officer from the overall activity of resistance to

In the cases of defendants Jones, William Rogers, Sidle, Walker and Zeno, verdicts of guilty were returned on one count only and no problem arises. In the case of Craft, the court suspended proceedings prior to the imposition of sentence and granted probation; since no sentence has yet been pronounced, section 654 has not yet come into effect as to him. In the case of Robert Rogers, the court imposed a prison sentence on count I, but suspended further proceedings on counts VI and VIII and granted probation on those counts; since sentence has been imposed on only one count, there was no violation of section 654.

However, as to four defendants, the court imposed concurrent sentences on more than one count; as to these defendants we reverse the sentences imposed on those counts carrying the lesser penalty. (*People* v. *McFarland, supra* (1962) 58 Cal.2d 748, 763.)

In the cases of defendants Craft, Jones, William Rogers, Sidle and Zeno the judgments (orders granting probation) are affirmed.

In the case of Robert Rogers the judgment on count I and the judgment (order granting probation) on counts VI and VIII are affirmed.

In the case of defendant Buice, the judgment is reversed insofar as it imposes sentence on count II (simple assault) and on count VI (simple assault); otherwise the judgment is affirmed.

In the case of defendant Coleman, the judgment is reversed insofar as it imposes sentence on count I (§ 69), on count VII (§ 217) and on count VIII (§ 245, subd. (b)); otherwise the judgment is affirmed.

In the case of defendant Jingles the judgment is reversed insofar as it imposes sentence on count I (§ 69) and on count X (§ 245, subd. (b)); otherwise the judgment is affirmed.

In the case of defendant Rivers, the judgment is reversed insofar as it imposes sentence on count VI (simple assault); otherwise the judgment is affirmed.

Burke, P. J., and Jefferson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 17, 1964. Mosk, J., did not participate therein.

---

and attacks on the entire police group. It follows that, under the special circumstances of this case, sentence can validly be imposed on only one conviction under section 245, subdivision (b), as to any one defendant.

Reporter's Note: On December 30, 1964, the court made the following order:

THE COURT.—Pursuant to Rule 25, subdivision (d) of the California Rules of Court, the remittitur previously issued is recalled; the judgment heretofore entered is corrected by deleting the first paragraph thereof and substituting in place thereof the following:

"In the cases of defendants Craft, Jones, William Rogers, Sidle, Walker and Zeno the judgments (orders granting probation) are affirmed."

In all other respects the judgment as heretofore entered shall remain unchanged. Let the corrected remittitur issue accordingly.

*[Appendix on following pages]*

APPENDIX—Charges and disposition thereof in *People v. Buice et al.*

| Count | Persons Charged | Acquitted | Dismissed | Convicted |
|---|---|---|---|---|
| I<br>(Pen. Code, § 69) | All | Morris<br>Willey | Augustine | Buice<br>Coleman<br>Craft<br>Jingles<br>Jones<br>Rivers<br>R. Rogers<br>W. Rogers<br>Sidle<br>Walker<br>Zeno |
| II<br>(Pen. Code, § 245, subd. (b)) | Buice<br>Jones<br>Morris<br>Walker | Morris<br>Walker | Jones | Buice (simple assault) |
| III<br>(Pen. Code, § 245, subd. (b)) | Jones<br>Zeno | Zeno | Jones | None |
| IV & V<br>(Pen. Code, § 217) | Morris | Morris | None | None |
| VI<br>(Pen. Code, § 245, subd. (b)) | Buice<br>Coleman<br>Craft | Jones | W. Rogers | *As Charged:*<br>Coleman<br>R. Rogers |

(*Appendix continued on next page*)

APPENDIX—(Continued)

| Count | Persons Charged | Acquitted | Dismissed | Convicted |
|---|---|---|---|---|
| VI (Pen. Code, § 245, subd. (b)) (Continued) | Jones<br>Rivers<br>R. Rogers<br>W. Rogers | | | Of simple assault<br>Buice<br>Craft<br>Rivers |
| VII (Pen. Code, § 217) | Coleman | None | None | Coleman |
| VIII (Pen. Code, § 245, subd. (b)) | Coleman<br>R. Rogers | None | None | Coleman<br>R. Rogers |
| IX (Pen. Code, § 245, subd. (b)) | Jingles | None | None | Jingles |
| X (Pen. Code, § 245, subd. (b)) | Jingles | None | None | Jingles (of simple assault) |
| XI (Pen. Code, § 245, subd. (b)) | Jingles | None | Jingles | None |
| XII (Pen. Code, § 245, subd. (b)) | Augustine<br>Buice<br>Craft<br>Rivers<br>Sidle<br>Willey<br>Zeno | All | None | None |