[No. A033578. First Dist., Div. Four. May 27, 1987.]

In re FREDERICK B., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK B., Defendant and Appellant.

COUNSEL

Edward R. Roybal, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ann K. Jensen and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**POCHÉ, J.**—The issues presented on this appeal from a wardship order concern the status of a public school security guard and his authority to detain a student suspected of being involved with the sale of drugs on a public school campus.

### BACKGROUND AND PROCEDURE

Frederick B. was adjudged a ward of the juvenile court in 1982. In June of 1985 a supplemental petition was filed in which it was alleged that Frederick had possessed cocaine and possessed it for sale (Health & Saf. Code, §§ 11350, 11351); possessed marijuana (*id.* § 11357, subd. (b)); carried a concealed, loaded firearm on the grounds of a public school (Pen. Code, §§ 626.9, 12025, subd. (b), 12031, subd. (a)); and that Frederick "did wilfully and unlawfully resist, delay and obstruct Officer Jeffrey Bartlett, who was then and there a public officer discharging and attempting to discharge a duty of his office." (*Id.* § 148.)

A jurisdictional hearing was conducted by a referee. After being advised that Frederick had filed a suppression motion pursuant to Welfare and Institutions Code section 700.1, the referee heard the following testimony:

Jeffrey Bartlett testified that he is a "[s]chool police officer" employed by the Richmond Unified School District. His duties include "keep[ing] discipline in the schools, mak[ing] sure no outsiders are on campus, breaking up fights, things of that nature." On June 13, 1985, he was on duty at Richmond High School, where he had been working for about two and one-half months. At approximately 11:20 a.m. Bartlett was leaving a building on the north side of the campus when he observed Frederick, whom he knew to be a student, and Robert B. standing close together exchanging paper currency.

Bartlett approached the two boys and asked them what they had exchanged. Frederick stated that he had given Robert 50 cents. Bartlett, who

had "made two detainments for narcotics-related incidents on that end of the campus," responded that he wanted the boys to accompany him to the dean's office to "check[ ] it out." Frederick refused. Bartlett "tried to reason with him, tried to explain that if [Frederick's story was correct], then what is the difficulty in going down to the office and checking it out and clearing up the matter."

Frederick, who was "very obviously nervous," still refused. After several minutes of unsuccessfully trying to persuade Frederick to go to the dean's office, Bartlett used a walkie-talkie to summon another security officer. Upon hearing this, Frederick started to walk away. Bartlett "pursued him and stood in front of him and again . . . asked him to come to the office." In Bartlett's words: "At that point he turned away from me and started walking away again. I made the decision then to physically detain him." As Bartlett and another security officer were in the process of bodily restraining Frederick, Bartlett discovered a pistol in the front of Frederick's waistband.

Bartlett further testified that the officers wrestled Frederick to the ground, handcuffed him, and took him to the dean's office. Frederick was then searched. In addition to the firearm—which was loaded—Frederick was found to be carrying a number of baggies containing a white substance, $27 in cash, and a "half-smoked hand-rolled butt of a cigarette."

Richmond police Officer David Blaisdell testified that he went to the school at about noon; took possession of Frederick and the items; and transported them to jail. The parties stipulated that the white substance in the baggies was cocaine, and that the cigarette contained marijuana and cocaine.

Richmond Police Officer Eva Wilson testified that she was present when Frederick made a statement at about 6 p.m. that night. The substance of the statement was two-fold. First, Frederick admitted that he had purchased the cocaine and intended to sell it. Second, Frederick stated that "he had received the gun for a $25 quantity of cocaine . . . and that he kept the gun with him for protection because he was fearful of being robbed."

The only witness called by Frederick was Robert B. He testified that, at his request, Frederick had given him 50 cents for bus fare. They did not exchange cash. Robert testified that he showed Bartlett the coins Frederick had given him, following which Bartlett "said he thought that he had seen us making a transaction, so he wanted to take us down to the Dean's office and make a search." Robert's testimony regarding subsequent events (excluding the office search which he did not observe) did not significantly differ from Bartlett's.

Relying on the recent decision of *New Jersey* v. *T. L. O.* (1985) 469 U.S. 325 [83 L.Ed.2d 720, 105 S.Ct. 733], Frederick's counsel argued in support of the suppression motion that Bartlett did not have "rational suspicion" to connect Frederick with unlawful activity. From this premise it was further argued that Bartlett lacked justification for either a detention or a search of Frederick. The referee ruled that reasonable suspicion did exist and therefore denied the motion. The referee thereupon sustained all of the allegations of the supplemental petition with the exception of simple cocaine possession.

At the ensuing dispositional hearing, the referee made an order continuing Frederick's status as a ward and placing him in a county institution for six months. This timely appeal followed.

REVIEW

I

 Frederick commences his attack on the referee's denial of his suppression motion by correctly noting that Officer Bartlett was acting as a governmental official; that Bartlett's actions were therefore subject to the Fourth Amendment's protection against unreasonable searches and seizures; and that any violation by Bartlett of that protection would necessitate exclusion of any evidence obtained from such violation in any subsequent judicial proceedings. (See *New Jersey* v. *T. L. O., supra,* 469 U.S. 325 at pp. 333-337 [83 L.Ed.2d 720 at pp. 729-732]; *In re William G.* (1985) 40 Cal.3d 550, 558-561, 567-568 [text and fn. 17] [221 Cal.Rptr. 118, 709 P.2d 1287]; cf. *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530 [208 Cal.Rptr. 657] [exclusionary rule not applicable to school disciplinary proceedings].) But exclusion is presently required only if commanded by force of the United States Constitution. (Cal. Const., art. I, § 28, subd. (d); *In re Lance W.* (1985) 37 Cal.3d 873, 879, 890 [210 Cal.Rptr. 631, 694 P.2d 744]; *In re Robert B.* (1985) 172 Cal.App.3d 763, 771 [218 Cal.Rptr. 337].) We therefore examine whether Bartlett's actions were reasonable according to federal standards, with reference to California authorities where appropriate.

 Both the United States and the California Constitutions have been construed to permit governmental searches of students and their effects if founded upon reasonable suspicion that "the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." (*New Jersey* v. *T. L. O., supra,* 469 U.S. 325 at p. 342, fn. omitted [83 L.Ed.2d 720 at p. 735]; accord *In re William G., supra,* 40 Cal.3d 550 at p. 564; *In re Robert B., supra,* 172 Cal.App.3d 763 at p. 771.) What is at issue here is not a search but a detention. A detention, however, is also

governed according to federal law by a variant of the reasonable suspicion test, i.e., whether the detaining officer has reasonable suspicion that the person to be detained has been, is, or is about to be engaged in criminal activity. (*United States* v. *Hensley* (1985) 469 U.S. 221, 227 [83 L.Ed.2d 604, 611, 105 S.Ct. 675]; *United States* v. *Place* (1983) 462 U.S. 696, 702-703 [77 L.Ed.2d 110, 117-118, 103 S.Ct. 263]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906-907, 88 S.Ct. 1868].)

"The touchstone of . . . analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry* v. *Ohio,* 392 U.S. 1, 19 (1968). Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' *United States* v. *Brignoni-Ponce,* 422 U.S. 873, 878 (1975)." (*Pennsylvania* v. *Mimms* (1977) 434 U.S. 106, 108-109 [54 L.Ed.2d 331, 335-336, 98 S.Ct. 330]; see *New Jersey* v. *T. L. O., supra,* 469 U.S. 325 at p. 337 [83 L.Ed.2d at pp. 731-732].) Within this context the countervailing factors have been identified as follows: "Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. . . . [T]he preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." (*New Jersey* v. *T.L.O., supra,* 469 U.S. at p. 339 [83 L.Ed.2d at p. 733]; see *id.* at p. 350 [83 L.Ed.2d at p. 740] (conc. opn. of Powell, J.).) It has also been recognized that "even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults . . . .' " (*Ginsberg* v. *New York* (1968) 390 U.S. 629, 638 [20 L.Ed.2d 195, 203, 88 S.Ct. 1274].)

Numerous California authorities are to the same effect. (See, e.g., *In re Robert B., supra,* 172 Cal.App.3d 763 at p. 770; *In re Thomas G.* (1970) 11 Cal.App.3d 1193, 1197-1198 [90 Cal.Rptr. 361]; *Myers* v. *Arcata etc. School Dist.* (1969) 269 Cal.App.2d 549, 558 [75 Cal.Rptr. 68].) As we shall see in part II, *post,* the duty to provide a safe educational setting has received statutory sanction. Failure to ensure student safety can result in civil liability for educational authorities. (See *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360].) Student safety has recently received an even more august backing. As Justice Mosk put it: "[W]e must also realize that innocent, law-abiding students have a constitutional right to protection from crime and criminals, and are entitled to a safe school environment. The people of California made that clear when they adopted article I, section 28, subdivision (c), of the Constitution: it provides that 'All students and staff of public primary, elementary, junior high and senior high

schools have the inalienable right to attend campuses which are safe, secure and peaceful.' " (*In re William G., supra,* 40 Cal.3d 550 at p. 574 (dis. opn. of Mosk, J.).)

■ There can be no question but that a detention was effected by Officer Bartlett when he in effect accused Frederick of being involved in a drug transaction and when he blocked Frederick's attempt to walk away. (*United States* v. *Puglisi* (11th Cir. 1984) 723 F.2d 779, 783; *United States* v. *Waksal* (11th Cir. 1983) 709 F.2d 653, 659; *United States* v. *Berry* (5th Cir. 1982) 670 F.2d 583, 597; *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 790-791 [195 Cal.Rptr. 671, 670 P.2d 325].) The question now before us is whether that detention was reasonable. We hold that it was.

The crucial circumstances were the passing of money and the area in which it occurred. The abstract innocence of the former was transformed by the latter, its complexion altered by its occurrence in the same area where Bartlett had recently made two "detainments for narcotics-related incidents." California previously has been skeptical of the so-called "high crime area" factor and attached minimal importance to it. (See *People* v. *Aldridge* (1984) 35 Cal.3d 473, 478-479 [198 Cal.Rptr. 538, 674 P.2d 240]; *People* v. *Loewen* (1983) 35 Cal.3d 117, 124 [196 Cal.Rptr. 846, 672 P.2d 436]; *People* v. *Bower* (1979) 24 Cal.3d 638, 645 [156 Cal.Rptr. 856, 597 P2d 115].) Federal courts, however, treat it as possessing considerably more pertinency. "The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely." (*United States* v. *Magda* (2d Cir. 1976) 547 F.2d 756, 758; accord *United States* v. *Rickus* (3d Cir. 1984) 737 F.2d 360, 365; see *United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873 at p. 884 [45 L.Ed.2d 607 at p. 618, 95 S.Ct. 2574].) The preeminent commentator on this subject agrees: "[T]he area in which the suspect is found is itself a highly relevant consideration. The character of the area, for one thing, may cast a different light upon certain conduct: ... Unspecific assertions that there is a crime problem in a particular area should be given little weight, at least as compared to more particular indications that a certain type of criminal conduct of the kind suspected is prevalent in that area." (3 LaFave, Search and Seizure (2d ed. 1987) § 9.3(c), pp. 456-457, fns. omitted.)

Bartlett did not rely on such an "unspecific assertion" but rather upon a suspicion particular to a very specific type of illegality. That suspicion coincided with Bartlett's personal experience, which enhances the credibility of that suspicion. (See *United States* v. *Cortez* (1981) 449 U.S. 411, 418 [66 L.Ed.2d 621, 629, 101 S.Ct. 690]; *United States* v. *Rickus, supra,* 737 F.2d 360 at p. 365; *People* v. *Loewen, supra,* 35 Cal.3d 117 at p. 123; *People* v. *McKinnon* (1972) 7 Cal.3d 899, 917 [103 Cal.Rptr. 897, 500 P.2d 1097].) Although Frederick's conduct was consistent with innocent activity, Bartlett

was entitled to confirm or deny that possibility. "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 95]; accord *People* v. *Duncan* (1986) 42 Cal.3d 91, 103 [227 Cal.Rptr. 654, 720 P.2d 2]; *People* v. *Stegman* (1985) 164 Cal.App.3d 936, 942-943 [210 Cal.Rptr. 855].) Bartlett's detention was therefore reasonable at its inception.

Bartlett was further justified in continuing the detention, and in blocking Frederick's repeated attempts to walk away while questioning Frederick, i.e., "to maintain the status quo momentarily while obtaining more information." (*Adams* v. *Williams* (1972) 407 U.S. 143, 146 [32 L.Ed.2d 612, 617, 92 S.Ct. 1921]; accord *United States* v. *Vanichromanee* (7th Cir. 1984) 742 F.2d 340, 344.) Frederick's reponses and his actions militated against discontinuing the detention. (See *New Jersey* v. *T. L. O., supra,* 469 U.S. 325 at p. 345 [83 L.Ed.2d 720 at p. 737]; *In re William G., supra,* 40 Cal.3d 550 at pp. 573-574 (dis. opn. of Mosk, J.); *In re Guillermo M.* (1982) 130 Cal.App.3d 642, 646 [181 Cal.Rptr. 856].)

What Bartlett proposed to confirm Frederick's asserted innocence was in effect shifting the scene of the detention to the dean's office. Moving a person from one location of temporary detention to another is appropriate for a variety of reasons. (See *United States* v. *Vanichromanee, supra,* 742 F.2d 340 at pp. 344-345 and authorities cited; *People* v. *Harris* (1975) 15 Cal.3d 384, 390-391 [124 Cal.Rptr. 536, 540 P.2d 632].) This suggestion is particularly fitting within the context of a public school. Officer Bartlett's proposal that they proceed to the dean's office entailed a reasonable accommodation of Frederick's right to personal security and Bartlett's duty to promote campus and student safety. Moreover, it would ensure that further questioning and a possible search would occur in a setting of greater privacy and in the presence of a school administrator. This would be to the mutual advantage of student and school official alike.

Frederick aborted this possibility by his final attempt to walk away. Officer Bartlett was well within his authority in preventing this by physically restraining Frederick. (*In re Gregory S.* (1980) 112 Cal.App.3d 764, 778 [169 Cal.Rptr. 540]; cf. *Michigan* v. *Summers* (1981) 452 U.S. 692, 702-705 [69 L.Ed.2d 340, 349-351, 101 S.Ct. 2587]; *United States* v. *Santana* (1976) 427 U.S. 38, 42-43 [49 L.Ed.2d 300, 305, 96 S.Ct. 2406].) ■ No Fourth Amendment interest or principle was violated when in the course of doing so Bartlett fortuitously discovered the weapon in Frederick's waistband. (*Texas* v. *Brown* (1983) 460 U.S. 730, 735-739 [75 L.Ed.2d 502, 508-512,

103 S.Ct. 1535]; *Payton* v. *New York* (1980) 445 U.S. 573, 586-587 [63 L.Ed.2d 639, 650-651, 100 S.Ct. 1371]; *United States* v. *$10,000 In U.S. Currency* (2d Cir. 1986) 780 F.2d 213, *passim*; *United States* v. *Murray* (9th Cir. 1985) 751 F.2d 1528, 1532-1533.)

Our conclusions are: (1) Officer Bartlett had reasonable if minimally grounded suspicion that Frederick was engaged in illegal activity; (2) the ensuing detention was reasonable in all respects; and (3) the discovery and seizure of the weapon was proper. It follows that Frederick's suppression motion was not well taken and was correctly denied.

## II

Education Code section 39670 is the general authority for public school guards. It grants a school district power to establish and deploy such security police "as may be necessary to ensure the safety of school district personnel and pupils, and the security of the real and personal property of the school district." Yet this and other statutes have taken significant pains to circumscribe the powers of these officers.

Education Code section 39670 goes on to declare: "It is the intention of the Legislature in enacting this section that a school district police or security department shall be supplementary to city and county law enforcement agencies and shall under no circumstances be vested with general police powers." Education Code section 39671 specifies that school security guards "are peace officers[ ] for the purposes of carrying out their duties of employment pursuant to Section 830.4 of the Penal Code." As relevant here, Penal Code section 830.4 provides in pertinent part: "The following persons are peace officers while engaged in the performance of their duties in or about the properties owned, operated, or administered by their employing agency, or ... anywhere in the state as to an offense committed, or which there is probable cause to believe has been committed, with respect to persons or property the protection of which is the duty of the officer ....

"...................

"(g) Persons employed as members of a police department of a school district pursuant to Section 39670 of the Education Code."

These statutes establish that school security personnel are peace officers but of a special category. Such officers are carefully limited in their powers and scope of operation. It is clear that they are denied "general police powers" in order that they do not supplant "city and county law enforcement agencies." Their duties are defined by their employing district and their

powers confined—chronologically, functionally, and geographically—to the performance of those duties alone. The status of officers such as Bartlett is important to the resolution of certain contentions made by Frederick.

One thorny issue left unanswered by both the United States and the California Supreme Courts in deciding that school officials may conduct searches based on reasonable suspicion is whether the same standard governs searches by peace officers. (See *New Jersey* v. *T.L.O., supra,* 469 U.S. 325 at p. 341, fn. 7 [83 L.Ed.2d at P. 735]; *In re William G., supra,* 40 Cal.3d 550 at pp. 561-562, fns. 11-12.) Stepping into this breach, Frederick argues that Bartlett, as a peace officer, required probable cause before acting. As we have seen, however, Bartlett was conducting a detention, not a search. It has also been established that detentions may be conducted by peace officers if supported by reasonable suspicion and that Bartlett's satisfied this test. Accordingly, we too have no occasion to consider whether school searches by peace officers require probable cause.

In a like vein, Frederick contends that when he was wrestled to the ground and handcuffed he was arrested, which requires probable cause. (See *Beck* v. *Ohio* (1964) 379 U.S. 89, 96 [13 L.Ed.2d 142, 147-148, 85 S.Ct. 223]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 479 [9 L.Ed.2d 441, 450, 83 S.Ct. 479]; Pen. Code, § 836; *People* v. *Campa* (1984) 36 Cal.3d 870, 879 [206 Cal.Rptr. 114, 686 P.2d 634].) We have already held that Officer Bartlett's action in preventing Frederick from leaving the scene was an integral part of a valid detention. If it is assumed for purposes of argument that probable cause was required before Frederick could be handcuffed, i.e., arrested, the discovery of the weapon provided it.

Frederick purports to perceive an inconsistency in the referee's classification of Officer Bartlett for purposes of denying Frederick's suppression motion and in sustaining the allegation that he had violated Penal Code section 148. According to Frederick, the referee did not consider Bartlett a peace officer in connection with the motion but did in connection with the allegation. This is an incorrect characterization of the record. In ruling on the motion the referee stated: "It's my view that while on the school grounds and operating as the police in the Richmond Unified Police Department do, that they should be in no different position than any other part of the administration of the school." But he also stated that "RUSD officers are, in fact, peace officers." As we have seen, the referee correctly treated Bartlett as a peace officer in evaluating whether his detention of Frederick was proper. Frederick's contention is thus mistaken in its essential factual prerequisite. With respect to the allegation concerning Penal Code section 148, its precise wording, which we have previously quoted, identified Bartlett as a "public officer." This category is not limited to peace officers but is considerably

broader. (See *People* v. *Scrivens* (1969) 276 Cal.App.2d 429, 433 [81 Cal.Rptr. 86]; *People* v. *Buice* (1964) 230 Cal.App.2d 324, 335 [40 Cal.Rptr. 877]; *Manss* v. *Superior Court* (1914) 25 Cal.App. 533, 535 [144 P. 298].) There was thus no inconsistency in accepting Bartlett as a peace officer for purposes of the motion and as a public officer for purposes of the petition.

Based on this purported inconsistency, Frederick perfunctorily asserts that this "arbitrary, inconsistent classification" violates the United States Constitution's guarantee of due process and the California Constitution's guarantee of equal protection. We do not address this claim for each and all of the following reasons: (1) no such inconsistency has been demonstrated; (2) the claim was not first raised in the trial court (*Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1133, fn. 5 [212 Cal.Rptr. 838]; *In re Marriage of Fuller* (1985) 163 Cal.App.3d 1070, 1076 [210 Cal.Rptr. 73]; *Fleming* v. *Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 43 [206 Cal.Rptr. 313]) and; (3) it is not supported by either argument or authority. (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72]; *French* v. *Construction Laborers Pension Trust* (1975) 44 Cal.App.3d 479, 492 [118 Cal.Rptr. 731].)

■ Finally, Frederick contends that substantial evidence does not support the finding that he violated Penal Code section 148. The uncontradicted evidence that Frederick had to be physically restrained by both security officers from leaving amply supports the referee's finding. (*In re E.L.B.* (1985) 172 Cal.App.3d 780, 787-788 [218 Cal.Rptr. 429]; *In re Gregory S., supra,* 112 Cal.App.3d 764 at pp. 778-780.)

The order is affirmed.

Anderson, P. J., and Sabraw, J., concurred.