[Crim. No. 18711. Second Dist., Div. Five. Apr. 20, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER HANDY, Defendant and Appellant.

## COUNSEL

Elinor Chandler for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Ronald S. Marks, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—This is an appeal from an involuntary commitment of defendant as a narcotic drug addict under the provisions of section 3100 et seq. of the Welfare and Institutions Code. The only question raised is the legality of defendant's initial arrest.

The People's only witness on this issue was Officer Long who was patrolling the neighborhood of 41st and Main Streets at about 11 p.m. on April 7, 1970. The patrol car was being driven by Long's partner, Officer Gingrich. The corner of 41st and Main was known to the officer to be a "frequented narcotic hangout." He had made several narcotic arrests at that location. On the night in question the police vehicle approached the

intersection from the west on 41st Street. When the officers were about 40 to 50 feet from the corner they saw defendant and another individual "standing approximately six inches to a foot away from each other." Their hands were between them "like shuffling or exchanging merchandise or objects." Two or three other persons were standing nearby. ▆▆▆ When the car had approached to within 20 to 30 feet, "they"[1] looked in the direction of the car "at which time their conversation ceased and their hands went into their pockets very rapidly."

The officers then left the vehicle to conduct an investigation which was to consist of talking to defendant and his companion. First, however, the "suspects" were asked to take their hands out of their pockets. Something was said to indicate to them that the officers wanted to talk to them. A pat down of defendant's companion produced a small automatic pistol from his front pocket. Apparently it was when Officer Long was ready to pat down defendant that he observed him sniffle, as if he had a cold. On further observation he saw that his eyes were contracted.[2] The officer then looked at defendant's arms and noticed hypodermic needle marks on the inside of "the" elbow, above the vein.[3] All these observations indicated that defendant was under the influence of an "opiate type drug." He was then arrested.

In determining whether the police had probable cause to arrest defendant it is important to keep in mind that the arrest was not for possession of narcotics. Although the precise basis of the arrest was never articulated by the arresting officer, it is obvious that he suspected defendant of a violation of section 11721 of the Health and Safety Code (use of or being under the influence of narcotics). Cases such as *Remers* v. *Superior Court*, 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11] and *Cunha* v. *Superior Court*, 2 Cal.3d 352 [85 Cal.Rptr. 160, 466 P.2d 704] are, therefore, only tangentially in point, since they involved the question of whether the arrestees concerned were actually in possession.

---

[1]Grammatically the officer could have been referring to the entire group. In context, however, it apears more likely that he was talking only about defendant and the person with whom defendant appeared to have had some sort of transaction.

[2]During the officer's direct examination he seemed to imply that it was necessary for him to use his flashlight to make this last observation. On redirect he testified: "The area was well lit. The defendant was facing away from the light. I could observe his pupils were contracted, where they should have been wide open like a camera lens, but they were closed." He made this observation before using his flashlight. To the extent that it is of any legal significance, we must assume that the court believed the latter version.

[3]On cross-examination the officer was unable to recall whether defendant's sleeves had to be rolled up to make this particular observation.

■ The only real question here is whether the officers were entitled to seek an interview with defendant and his companion and to temporarily detain them for that purpose.[4]

This is not a case like *People* v. *One 1960 Cadillac Coupe,* 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706] where the court characterized the defendant as being indistinguishable "from any other harried citizen who may have innocently parked his automobile [near a hidden narcotics kit.]" Nor is this a case like *People* v. *Moore,* 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800], where the defendant was merely making a telephone call in an area frequented by narcotics peddlers and looked "nervous." Finally the case is distinguishable from *Irwin* v. *Superior Court,* 1 Cal.3d 423 [82 Cal.Rptr. 484, 462 P.2d 12], where defendant was merely standing next to a piece of baggage the numbering on the tag of which indicated that it had been checked in right after a package belonging to a person who had been arrested for possessing marijuana in the package. Defendant was, after all, discovered in an apparent transaction of some kind in an area known for narcotic activity and he did act in a manner which could be interpreted as betraying a guilty conscience when he realized that he was being observed by the police.

We realize that in *Cunha* v. *Superior Court,* 2 Cal.3d 352 [85 Cal.Rptr. 160, 466 P.2d 704] the facts were fairly similar and the Supreme Court, by dictum, expressed doubt whether the officers even had a right to temporarily detain the suspects. There, as here, the officers' observation was made in an area known to be the site of frequent narcotics traffic. Before engaging in their transaction the suspects appeared to look around as if to see whether they were being observed. Then some type of object appeared to be exchanged for money. They were immediately arrested.

About the only factual differences between *Cunha* and this case are that here the transaction took place at 11 p.m. and not in the middle of the

---

[4]We consider it immaterial whether the record supports the pat down of the companion. Nothing incriminating as far as defendant is concerned resulted from it. We assume in our discussion that defendant was, indeed, detained. The Attorney General does not suggest the contrary. We note that below Officer Long tried to give the impression that had defendant walked away from the confrontation, he would have been permitted to do so. The effort was not too successful. "Q. [While his companion was being arrested] Mr. Handy was required to stand there? A. He stood there. Q. You kept him standing there, did you not? You wouldn't have let him go, would you? A. I can't assume that. Q. Officer, would you have left that man just wander off down the street after you pulled up like that? A. I cannot state. Q. Did you tell Mr. Handy not to move? A. No, I did not. Q. Did anybody in your presence tell him not to move? A. No, they did not. Q. What did Mr. Handy do—just stand there without your saying a word to him? A. He stood there while we conducted an investigation. Q. You didn't have to say a word to keep him standing there? A. No. . . ."

afternoon, a time when innocent transactions between pedestrians in areas known for narcotic traffic are perhaps more frequent. Further there is the fact that defendant and his companion acted suspiciously after, rather than before, they had seen the officers.

We find it difficult to make a legal distinction out of these factual differences. We prefer to base our holding on the belief that, on closer inspection, the Supreme Court would have found that a reasonable detention was justified under the facts in *Cunha*.

When our Supreme Court authoritatively held in *People* v. *Mickelson*, 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658], that temporary detentions without probable cause to arrest did not violate the Fourth Amendment—a holding in which the United States Supreme Court now concurs (*Terry* v. *Ohio*, 392 U.S. 1, 20-24 [20 L.Ed.2d 889, 905-908, 88 S.Ct. 1868])—it said that its rule ". . . wards off pressure to equate reasonable cause to investigate with reasonable cause to arrest, thus protecting the innocent from the risk of arrest when no more than reasonable investigation is justified. . . ." That is as true today as it was then.

Once the People are over the detention hurdle, all further problems are solved. ■■■ Even if we disregard the rather unsatisfactory proof concerning the visibility of the needle marks without an intrustion into defendant's privacy by having him roll up his sleeves (cf. *People* v. *Moore*, 69 Cal.2d 674, 678 [72 Cal.Rptr. 800, 446 P.2d 800]), we believe that the sniffle and the contracted condition of his pupils, particularly the latter, when viewed against the entire background—the area, the time of night, the apparent transaction—justified a reasonable assumption that defendant was then under the influence of a narcotic.

The order appealed from is affirmed.

Stephens, J., and Aiso, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 17, 1971.