[Crim. No. 23115. Jan. 26, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
SYLVESTER PETER ALDRIDGE, Defendant and Appellant.

474

COUNSEL

Stephen Alan Munkelt, under appointment by the Supreme Court, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assis-

tant Attorney General, Lillian Lim Quon and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—Defendant appeals from a judgment of conviction entered on his plea of guilty to a charge of receiving stolen property. He contends that he was detained and searched illegally, and that the trial court erred in denying his motion to suppress the evidence obtained in that search (Pen. Code, § 1538.5, subd. (m)). We conclude that the contention is meritorious and that the judgment must be reversed.

For more than two years Officer Angel Baldenegro had patrolled southeast San Diego. He testified that the parking lot of Dr. J's Liquor Store on Logan Avenue is a place where drug transactions are common and people are frequently armed with weapons. He had made more than two hundred arrests in the area, and was aware that only hours before the incident in question other officers had made three narcotics arrests on Dr. J's lot.

Baldenegro testified that it is his routine practice to conduct "field interviews" of every person he sees on the parking lot. At 10:15 p.m., intending to follow this practice, Baldenegro and his partner drove their marked patrol car onto the lot in order to question a group of persons congregating there in the dim light. The officers suspected that some persons in the group might possess illegal drugs or weapons.

As the police car entered the lot, the group slowly began to disperse. Four men, including defendant, first walked and then ran across Logan Avenue. Baldenegro radioed a nearby patrol car to request that the four men be stopped and "interviewed" for "any kind of narcotic activity." As Officer Carlisle and his partner received the call, they saw defendant and the three others run across Logan, and then walk toward them. Carlisle left his vehicle to interrogate the four men, while his partner went to assist Baldenegro. All those remaining on the lot were ordered to place their hands against the wall of the store.

Defendant and his three companions were carrying packages that appeared to contain alcoholic beverages. Carlisle asked each for identification. He testified they were fidgety, difficult to "control," and seemed about to flee. Fearing for his own safety, he ordered them to put their packages on the ground and stand next to the patrol car, and asked if any had guns or knives. After one man produced a linoleum knife, Carlisle ordered them to turn

around and put their hands on the car. While patting down defendant, he discovered a loaded gun later found to be stolen.

Defendant was charged with being an ex-felon in possession of a firearm (Pen. Code, § 12021, subd. (a)), receiving stolen property (§ 496, subd. 1), and carrying a loaded firearm in a public place (§ 12031, subd. (a)). He moved to suppress the gun and to set aside the information, on the ground that both the detention and the search were illegal. After the motion was denied, defendant pleaded guilty to receiving stolen property and the other charges were dismissed.

■ Defendant first contends he was unreasonably detained. ■ Of course, a temporary detention for questioning or limited investigation may be justified by circumstances falling short of probable cause to arrest. (*Terry v. Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868]; *In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957]; *People v. Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) We realize that experienced police officers develop an ability to perceive the unusual and suspicious, and we recognize the right and duty of officers to make reasonable investigation of such activities. (*People v. Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; *People v. Courtney* (1970) 11 Cal.App.3d 1185, 1189-1190 [90 Cal.Rptr. 370].) However, these limited intrusions into personal privacy must comport with state and federal constitutional prohibitions against unreasonable searches and seizures. (*People v. Bower* (1979) 24 Cal.3d 638, 643 [156 Cal.Rptr. 856, 597 P.2d 115]; *Terry v. Ohio, supra,* 392 U.S. at p. 16 [20 L.Ed.2d at p. 903]; *United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 878 [45 L.Ed.2d 607, 614, 95 S.Ct. 2574].)

■ The general rule that every presumption on appeal favors the trial court's findings of fact does not apply to rulings on questions of law. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People v. Gee* (1982) 130 Cal.App.3d 174, 178-179 [181 Cal.Rptr. 924].) ■ Because the facts bearing on the legality of the detention in this case are undisputed, there is no factual issue entitled to a substantial evidence standard of review; rather, it is the ultimate responsibility of this court to measure the facts as found by the trier against constitutional standards. (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

It cannot be disputed that defendant was detained. ■ A detention occurs "whenever a police officer accosts an individual and restrains his freedom to walk away," (*Terry v. Ohio, supra,* 392 U.S. at p. 16 [20 L.Ed.2d at p. 903]) or when an officer stops an individual because he sus-

pects that person "may be personally involved in some criminal activity." (*In re Tony C., supra,* 21 Cal.3d at p. 895.) It thus becomes necessary to test Carlisle's actions against the requirements of article I, section 13, of the California Constitution.

Officer Carlisle testified that his sole reason for detaining defendant was the radio broadcast he received from Officer Baldenegro. ■ Therefore, the detention of defendant can be found reasonable only if Baldenegro had sufficient information to justify making the detention himself. (*Cf. Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 667 [87 Cal.Rptr. 202, 470 P.2d 11]; *People* v. *Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *People* v. *Lara* (1967) 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202].)

■ In order to justify a detention "the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience (*People* v. *Superior Court* (*Kiefer*), *supra,* 3 Cal.3d at p. 827), to suspect the same criminal activity and same involvement by the person in question." (*In re Tony C., supra,* 21 Cal.3d at p. 893; *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

From his more than two years' experience during which he made numerous arrests in Dr. J's parking lot for narcotics, weapons and assault, it is obvious that Baldenegro entertained a subjective suspicion that defendant was involved in criminal activity. Indeed, he suspected anyone and everyone on or leaving that site. ■ However, the People suggest only three factors which they claim objectively justify a detention: it was nighttime; the incident took place "in an area of continuous drug transactions"; and defendant and his companions apparently sought to avoid the police.

Whether considered separately or together, these factors do not justify the detention. First, being in the area of a liquor store at 10:15 p.m., possibly carrying alcohol, is neither unusual nor suspicious. (*People* v. *Lathan* (1974) 38 Cal.App.3d 911, 915 [113 Cal.Rptr. 648].) Next, we have explained that persons may not be subjected to invasions of privacy merely because they are in or passing through a "high crime area." (*People* v. *Bower, supra,* 24 Cal.3d at p. 645; *People* v. *Loewen, supra,* 35 Cal.3d at p. 124; see also *Brown* v. *Texas* (1979) 443 U.S. 47, 52 [61 L.Ed.2d 357,

362-363, 99 S.Ct. 2637].) The People attempt to distinguish the present case by asserting that Dr. J's was not merely a "high crime area," but rather a specific locale in which a number of crimes had occurred. A history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality.

Finally, the suggestion that an apparent effort to avoid a police officer may justify a detention has been refuted in numerous decisions of this court. (*People* v. *Bower, supra,* 24 Cal.3d at pp. 647-648, and cases cited.) Under different circumstances, such flight might imply a consciousness of guilt, and combined with other objective factors could justify an investigative stop. Here, however, Baldenegro admittedly intended to follow his routine practice to make an indiscriminate investigative detention of all persons on the lot. The record reveals that defendant had previously been detained and interviewed by Baldenegro on Dr. J's lot, and it can safely be assumed that he knew what was in store for him if he were to remain. Defendant had every right to avoid such persistent harassment.

As we have noted previously, "the interest at stake is far from insignificant: it is the right of every person to enjoy the use of public streets, buildings, parks and other conveniences without unwarranted interference or harassment by agents of the law. [Citation.] 'A police officer may not use the authority of his uniform and badge to go around promiscuously bothering citizens.'" (*In re Tony C., supra,* 21 Cal.3d at p. 893.) In this case, avoiding contact with the police was the only means by which the individuals on Dr. J's parking lot could protect their right of privacy. "To hold that police officers should in the proper discharge of their duties detain and question all persons in that location or all those who act nervous at the approach of officers would for practical purposes involve an abrogation of the rule requiring substantial circumstances to justify the detention and questioning of persons on the street." (*People* v. *Moore* (1968) 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800].) The departure of defendant and others from an imminent intrusion cannot bootstrap an illegal detention into one that is legal.

In an extention of the "flight" contention, the People maintain the detention was justified by an alleged effort of the four men to "avoid discovery of contraband." If there were any objective evidence to support this conclusion, the claim might be meritorious; a mere subjective speculation as to the men's purported motives, however, carries no weight. Equally meritless is the suggestion that because Officer Carlisle found the men carrying packages containing alcoholic beverages, Baldenegro was initially warranted in entering the lot to determine if alcohol was being illegally consumed. Officer

Baldenegro's own testimony regarding his purpose refutes this theory. ▮ A detention may not be justified after the fact on a subsequently contrived basis not relied on by the officer at the time the events occurred. (*People* v. *Bower, supra,* 24 Cal.3d at p. 647.)

Finally, the People cite a number of cases in which detentions have been upheld after officers "observed evidence suggestive of narcotics activity and furtive conduct." In *People* v. *Garcia* (1981) 121 Cal.App.3d 239 [175 Cal.Rptr. 296], officers saw the defendant and another placing a television set in a car trunk, in a residential area. When they observed the officers, they looked shocked and walked rapidly away from their car and the television toward a nearby bar. Thus the officers had some objective evidence of suspicious conduct before they made a detention. In *People* v. *Handy* (1971) 16 Cal.App.3d 858 [94 Cal.Rptr. 387], officers noticed the defendant and another man "shuffling or exchanging merchandise." When they saw the police they quickly put their hands in their pockets. Hence, the officers actually witnessed an exchange, in circumstances that may have reasonably indicated presence of contraband. In *People* v. *Collom* (1968) 268 Cal.App.2d 242 [73 Cal.Rptr. 707], an officer with many years of narcotics experience witnessed a furtive exchange of some object for money. After the transaction, the defendant saw the officer and ran. Thus the officer had actually seen a narcotics transaction, and the flight following that activity merely added to his already substantial objective evidence of criminal activity. Finally, in *Flores* v. *Superior Court* (1971) 17 Cal.App.3d 219 [94 Cal.Rptr. 496], an officer with extensive narcotics experience witnessed the defendant leave a public restroom with a wadded object the officer thought to be a narcotics kit. The defendant changed direction several times to avoid the police, and appeared anxious to hide the wadded materials. Thus the officer had some objective basis for suspicion about the defendant. By contrast, the officer in the present case made no observation that objectively suggested narcotics activity or any other criminal conduct.

Baldenegro's stated intent and consistently repeated policy was to conduct a general detention and interrogation of all persons on the lot, evidently hoping to uncover some evidence of some crime by some person. Our state and federal Constitutions were written precisely to outlaw such unrestricted general sweeps and searches. ▮ It has long been the law, as Justice Jackson wrote, that "a search is not made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." (*United States* v. *Di Re* (1948) 332 U.S. 581, 595 [92 L.Ed. 210, 220, 68 S.Ct. 222] (fn. omitted).)

▮ The People have not shown the required objective, specific, and articulable facts necessary to support this detention. Because the detention

was unlawful, defendant's motion to suppress the weapon discovered in the ensuing pat-down search should have been granted. In view of our conclusion that the detention was invalid, we need not reach the issue of the legality of the pat-down.

The judgment is reversed.

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**RICHARDSON, J.***—I respectfully dissent.

In my view, the challenged detention and search were valid and the trial court properly denied defendant's motion to suppress evidence obtained in that search.

Agreeing as I do with the analysis contained in Presiding Justice Cologne's opinion for the Court of Appeal in this case, I incorporate and adopt pertinent parts of that opinion as follows:

"Aldridge asserts the three factors of location in an area of continuous drug transactions, nighttime, and apparent desire to avoid contact with police are insufficient to permit the conclusion the officer's suspicions were objectively reasonable . . . . He relies on eliminating the importance of these factors much as was done in *People* v. *Bower* [1979] 24 Cal.3d 638, at pages 645 to 646 [156 Cal.Rptr. 856, 597 P.2d 115], which discussed the 'nighttime factor' and 'high crime' area assertion . . . . Since Aldridge's view of the circumstances shown to be involved here is too narrow, it is unpersuasive.

"There is not present here a vaguely defined high crime area as was the case in *Bower*. Rather, we consider a specific lot next to Dr. J's Liquor Store where arrests in the hundreds for drugs or weapons were made by the very officer involved for over two years, where he was attacked in a near riot situation connected with a drug offense the night before and where other officers had arrested three persons earlier this very night. These specific facts connected with this specific location take the case out of the category of mere 'high crime' area subject to the criticisms leveled in *Bower*. The important factor here is that the lot is the focal point of criminal activity. It is a place established as a central point for narcotics trafficking and riots.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

"The nighttime or darkness factor is dissimilar from that involved in *Bower* as well. The nighttime, darkness factor here is compounded by the presence of a large crowd of people present in the dimly lit area. This combined factor of darkness and presence of a large group there, in light of Officer Baldenegro's long and recent experience with drug offenses at Dr. J's lot and the riot there only the night before, could reasonably lead to the belief '(1) some activity out of the ordinary had taken place or was occurring or about to occur,' and '(2) the activity was related to crime' (*People* v. *Bower, supra,* 24 Cal.3d 638, 644).

"When the four persons ran from the crowd in this dark location upon seeing the police car enter the lot, again considering the officer's experience, it was reasonable to believe the runners were '(3) . . . connected with the activity' (*Bower, supra,* 24 Cal.3d 638, 644). In *People* v. *Martin* [1956] 46 Cal.2d 106 [293 P.2d 52], patrol officers turned their spotlight on a car parked on a lovers' lane at night and saw two men inside. This, coupled with the man's flight, provided reasonable cause to investigate. The court said (at p. 108), 'their sudden flight from the officers and the inference that could reasonably be drawn therefrom that they were guilty of some crime [citation], left no doubt not only as to the reasonableness but as to the necessity for an investigation.' (See also *People* v. *Robinson* [1976] 58 Cal.App.3d 363, 366 [129 Cal.Rptr. 915]; *People* v. *Rosenfeld* [1971] 16 Cal.App.3d 619, 621-623 [94 Cal.Rptr. 380].)

"The detention here was reasonable.

"As to the pat-down by Officer Carlisle, there is no question it was reasonable based on the specific facts and circumstances. Alone with the four wandering, circling individuals, one of whom had produced a large knife and all of whom oddly fidgeted in their self-searches for weapons, the frightened Carlisle acted properly for his own protection in conducting the pat-down (*Terry* v. *Ohio* [1968] 392 U.S. 1, 27, 30 [20 L.Ed.2d 889, 88 S.Ct. 1868, 1883, 1884-1885])."

I would affirm the judgment.