[Crim. No. 15693. Fourth Dist., Div. One. Aug. 23, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
SENTARIAN FIELDS, Defendant and Appellant.

[redacted]

---

**COUNSEL**

Paul E. Bell, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**COLOGNE, Acting P. J.**—Sentarian Fields appeals convictions by his plea of guilty to charges of forcible oral copulation (Pen. Code,[1] § 288a, subd. (c)) and rape (§ 261), and his sentence.

---

[1]All statutory references are to the Penal Code unless otherwise specified.

On August 31, 1982, while Ms. T. was watching television, Fields silently entered her condominium through a window and hid in the hallway near the bedroom. About 11:30 p.m., as Ms. T. was walking toward her bedroom, Fields grabbed her, blindfolded her and told her not to scream. She struggled, but stopped when he told her he had a knife. He then tied her hands, retied the blindfold and gagged her. He led her into the bedroom and, after a discussion of whether a man was coming, put a knife to her throat. He removed the gag from her mouth for awhile and asked if she had ever made love to a black man. He also told her he had been in jail since he was 20 for killing a man.[2]

Over approximately the next hour and a half, Fields proceeded to fondle her, force her to orally copulate him, orally copulated her, raped and sodomized her. He then took some money from her purse and fled. Ms. T. then went to her neighbor's and called the police.

The police arrived about 1 a.m. Ms. T. described her attacker as a slender, thin black male, young and possibly wearing jogging or warmup clothes. At the scene, the police found Fields' fingerprints and a distinctively marked sock left by the attacker. Seven latent prints, later identified as those belonging to Fields, were taken: two from the phone, one from the exterior window, one from the window sill, one from the deadbolt latch and two from the top of the latch.

About 7 a.m., Officer Steven Bellizzi was on patrol in the vicinity. He had heard the radio report of the crime and the general description of the attacker. He saw a black male wearing jogging or sweat pants and a light blue jacket walking down the street about a block and a half from the scene of the crime. He noted the person appeared startled by the officer, showed a look of fear in his eyes and looked away. The officer thought Fields matched the description of the rape suspect so he radioed for additional information and a backup unit. Bellizzi then stopped Fields. He told Fields a rape had occurred in the neighborhood and that he matched the description of the person involved. Bellizzi patted him down for weapons. He did not find any weapons but did note Fields was wearing several shirts. Fields said he had just run up a hill, but Bellizzi did not believe him as Fields did not appear winded or perspiring nor did he have a rapid pulse. Fields said he was supposed to be at Sweetwater High School at 7:30, but the officer testified he intended to detain Fields until the investigating officers arrived. Bellizzi heard over the radio the officers had just left the scene and would be there shortly.

---

[2]This was not true. Fields was only 17, had only a minor juvenile record and had never been in jail.

Within five minutes after Fields' stop, the officers investigating the rape, having heard Bellizzi's broadcast of the stop, arrived at the place where Fields was being detained. They asked to see Fields' socks. He had two on one foot and only one on the other. They discovered one of the socks he was wearing matched the one they had found at the scene. It had a blue stripe. At that point, they arrested him.

The total time which elapsed between the stop and the arrest was five minutes.

After Fields was transported to jail, booked and given his *Miranda* warning, he waived the rights and made a full confession admitting all the elements of the crimes of which he was charged.[3] He was accused by infor-

---

[3]In his statement to the police, Fields said: "He left his house and just started walking around and ended up in the apartment complex where the victim lives. He had made up his mind that he was going to rape some woman, so he started looking into the windows of the apartments and came to the one where the victim lived. He stood on the lawn next to the fence surrounding the patio, and because of his height was able to look over the fence into the victims living room. He observed the victim lying on the couch with very little clothes on. He continued to watch her for a period of time and then walked around towards the front door and looked into another window checking to see if any men were in the apt. He then walked to an area approx. 50' away and watched the house for approx. 30 minutes to see if any man came or went. He then went back over to the fence area and now the victim was lying on the floor, so he again went to the window next to the front door, and also attempted to look in the other windows of the apartment hoping that he could see or tell if a man was in the house. After he determined in his own mind that the woman was alone, he climbed the patio fence and removed the screen from a window and made entry. He crawled out into the hallway and waited (has no idea how long) for the woman to come down the hallway. Eventually the woman turned off the lights and started down the hallway at which time he jumped up and grabbed her. He had found some of her clothing in the hallway and it was an article of clothing that he pulled over her head. He put socks in her eyes and tied another piece of cloth around them to hold them in place, and also put a sock into her mouth to keep her from screaming.

"QUESTION: Did you have a knife when you went into the house?
"ANSWER: No I got the knife from the kitchen after I was in the house.
"QUESTION: What did you use to tie up her hands with?
"ANSWER: I found some speaker wire.
"QUESTION: Did you rape the lady?
"ANSWER: Yes.
"QUESTION: Did you put your penis in her mouth?
"ANSWER: Yes.
"QUESTION: Did you put your penis in her anus?
"ANSWER: I don't know what you mean.
"QUESTION: Did you butt-fuck the lady?
"ANSWER: Yes.
"QUESTION: Did you tell the lady that you were going to kill her?
"ANSWER: Yes.
"QUESTION: Would you have killed the lady?
"ANSWER: No, I just told her that to scare her.
"QUESTION: What did you do with the knife?
"ANSWER: When I was running away from the apartment, I threw it away somewhere.
" . . . . . . . . . . . . . . . . . . . . . . . .
"QUESTION: Where did you go after you left the lady's house?

mation of two counts of forcible oral copulation (§ 288a, subd. (c)), one count of sodomy (§ 286, subd. (c)), one count of forcible rape (§ 261, subd. (2)) and one count of robbery (§ 211). Burglary of a residence (§ 459) was alleged in separate counts, one with intent to commit theft and one with intent to commit rape. A knife-use allegation was added to the sex offenses (§ 12022.3), as well as to the burglary and robbery charges (§ 12022, subd. (b)). The information was later amended to combine the burglary counts alleging both intents and to add a third count of oral copulation.

Fields moved to suppress evidence under section 1538.5 and to dismiss the information under section 995. Both motions were denied.

Fields then entered a negotiated guilty plea to one count of forcible oral copulation and one count of rape, each with a knife-use allegation. He entered the plea pursuant to *People* v. *West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409], without personally admitting the factual basis. The remaining counts were dismissed as part of the bargain.

Since Fields was only 17 years old at the time of the offense, he was committed to the California Youth Authority (CYA) for an evaluation and study concerning his amenability to treatment by the CYA. The trial court, after reading the CYA report, the probation reports and hearing testimony by a retired intake and court liaison supervisor for the CYA, the victim and Fields, sentenced Fields to twenty-two years in state prison: eight years (the upper term) on the forcible oral copulation count with a three-year enhancement for using a knife and eight years (the upper term) for the forcible rape with a three-year enhancement for using a knife.

On appeal, Fields contends his detention was illegal, and the court erred in not giving sufficient weight to the CYA's finding of amenability, in using the same facts to enhance both counts, in failing to exercise its discretion to sentence under section 1170.1 rather than section 667.6, subdivision (c), and in imposing two knife-use enhancements.

I

Fields first contends his detention was unlawful.

A temporary detention for questioning or investigation is justified when the circumstances known or apparent to an officer include specific and

---

"ANSWER: I just running because I knew the police would be looking for me. . . I went up to the shopping center at Melrose and Orange. I saw a lot of police cars going by, but I kept hiding until it started to get light and I knew I better get home. I was on my way home when the policeman stopped me."

articulable facts which cause the officer to suspect (1) some activity relating to crime has taken place or is occurring or is about to occur, and (2) the person the officer intends to stop or detain is involved in that activity (*People v. Aldridge* (1984) 35 Cal.3d 473, 478 [198 Cal.Rptr. 538, 674 P.2d 240]). An officer's mere curiosity or hunch, or a rumor is not sufficient to justify a detention (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]). The officer's suspicions must be objectively reasonable so if a reasonable officer were in a similar situation, then that officer would suspect the same criminal activity and the same criminal involvement by the person in question (*People v. Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436]).

█ The good faith suspicion which warrants an officer's detention of a person for investigative reasons is necessarily of a lesser standard than that required to effect arrest (*People v. Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353]). █ Where there is a rational belief of criminal activity with which the suspect is connected, a detention for reasonable investigative procedures infringes no constitutional restraint (*ibid.*).

█ When the reasonableness of a detention is based upon a resolution of conflicting facts, the reviewing court must accept the factual findings of the trial court if supported by substantial evidence in making its determination whether the detention was lawful (see *People v. Aldridge, supra,* 35 Cal.3d 473, 477). The trial court's factual determination will not be reweighed on appeal (*People v. Flores, supra,* 12 Cal.3d 85, 92).

█ █ Fields argues the radio broadcast description, "tall, thin, black male, about 25 years old, possibly wearing jogging clothes," was too general to justify stopping him and, moreover, there was insufficient evidence to support the finding the victim described him as wearing jogging clothes.

█ First, we discuss whether there was sufficient evidence to conclude the victim said Fields was wearing jogging clothes. At the preliminary hearing, the victim testified one of the officers asked her what her attacker wore, but she could not recall what she answered. Officer Benito Franco, who interviewed the victim shortly after the attack, remembered she said something about the suspect's clothes but he also could not recall her answer. The communications officer testified she received the description from Officer Franco that the suspect was a black male, thin, armed with a knife, possibly wearing jogging clothes, about 25 years old and on foot in the area. She wrote down the description for the radio dispatcher but did not retain the note she had written. Finally, another officer also testified Officer

Franco and another officer about 1 a.m. told him the suspect was wearing either warmups or jogging clothes.

This evidence supports one of two inferences—either the victim told Officer Franco or another officer her attacker was probably wearing warmups or jogging clothes or, as Fields urges, the officers made up this part of the description out of whole cloth. Since the trial court believed the former inference after listening to the witnesses and judging their credibility, and since there is substantial evidence to support this inference, we are bound by it on appeal (see *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]).

■ Second, we consider whether the detention was reasonable. Officer Bellizzi heard the broadcast description of the rape suspect. He was informed by radio a crime had been committed.

The description of the assailant was more than a general description; it provided several unique distinguishing features—sex, height, race, age and attire. Compare these unique features with those given in *People* v. *Flores, supra,* 12 Cal.3d 85 at page 89,[4] and *People* v. *McCluskey* (1981) 125 Cal.App.3d 220 at page 223 [178 Cal.Rptr. 7],[5] and it is clear there was enough to justify the detention.

Fields was wearing a light blue jacket and jogging or sweat pants. He was seen in the same general vicinity of the rape and generally matched the description of the suspect, being of the same race (black), sex (male) and height (six feet), and of the same general age group (young adult) and build (on the thin side). Although he was observed six hours after the crime as we explain later, this was not such a lengthy period in light of all the other factors as to make the detention unreasonable. Bellizzi felt Fields matched the description of the rape suspect. He also noticed Fields appeared to be startled by him, had a "look of fear in his eyes" and then quickly looked away. In the initial questioning, Fields' stated he had been running, but that did not coincide with the facts—not perspiring, breathing hard or with a rapid pulse. Thus, Bellizzi's original suspicions were provided additional support immediately after the stop. As we noted in *People* v. *McCluskey, supra,* 125 Cal.App.3d 220, at page 227: "The fortuitous fact that one part

---

[4]In *Flores,* the descriptions were Mexican Americans (male), wearing dark clothing and wide brim hats, 5 feet 8 inches to 5 feet 9 inches and weighing 160 to 165 pounds, and operating a General Motors car, dark in color of a model year in the 40's, held sufficiently unique to justify a detention. The detention there was four days after the burglary.

[5]In *McCluskey,* the assailant was described as a male Chicano 19 to 21 years old, about 5 feet 10 inches tall, brown hair with center part, moustache and wearing a jacket, was held sufficient for the detention of a 20-year-old Mexican male with dark hair and dark jacket riding as a passenger in a car. The detention here was five minutes after the burglary.

of this sufficiently detailed, accurate description of the [suspect] may have included a disproportionate number of persons within the community does not vitiate the reasonableness of the stop. If such commonality were to invariably impair a detention, only those with unique physical characteristics could be stopped. Obviously, such a rule makes little sense."

In *McCluskey,* the court reversed a suppression order and held the "[officer] was justified in stopping the [car] and detaining its occupants based on a combination of several factors: his knowledge a robbery had recently occurred in the vicinity, his observation the suspect's car was traveling in a direction consistent with the suspect's involvement in the robbery and his receipt of the suspect's description which included ethnic origin, attire, sex and age." (125 Cal.App.3d 220, 226-227.)

The only difference between the facts in *McCluskey* and in this case is that in *McCluskey* the stop was five minutes after the offense and here the stop occurred six hours later. ■ Certainly the length of time that transpires after the offense before the stopping may be a factor. If the description is sufficiently unique, the time lapse may expand to hours, days, or longer. In determining whether a particular description is sufficiently unique, the description cannot be considered in a vacuum. The ultimate question is whether the description affords a sufficient basis for "selective investigative procedures," vis-à-vis a universe made up of all persons within fleeing distance of the crime in question (3 La Fave, Search and Seizure (1978) § 9.3, p. 87; *People* v. *Flores, supra,* 12 Cal.3d 85, 91-92). There is no definitive amount of time that should be considered a bar to a detention based on a particular description, but under all the facts of this case we cannot say the six-hour passage of time is a bar to the detention.

■ Considering the heinousness of the crimes, the hour of the day, the proximity to the crime scene and the fact the suspect could have been hiding until daylight when his running in jogging clothes would provide an apparent reason for his presence in, and departure from, the neighborhood, there was an objective basis for the officer's suspicions.

A fact which also bears particular importance here is the intrusion represented by this detention was minimal. At the officer's announcement he wanted to ask some questions, Fields stopped voluntarily and, while the officer testified he did not intend to let Fields leave until the investigating officer arrived, he made no effort to physically restrain his suspect. Fields did say he was supposed to be at a nearby school at 7:30 a.m., but this was still a half hour away, but Fields expressed no concern in talking to the investigating officers. In addition, his statement he had been running was

not consistent with the officer's observations raising further suspicion. The detention lasted a total elapsed time of only five minutes.

Under all the circumstances, we must find this "detention" was reasonable.

## II

Fields contends the trial court erred in not giving the CYA's finding he was amenable to its programs great weight and in imposing a prison sentence because of the court's disagreement with CYA parole policies.

Fields relies primarily on *People* v. *Carl B.* (1979) 24 Cal.3d 212 [155 Cal.Rptr. 189, 594 P.2d 14]. In 1979, when *Carl B.* was decided, Welfare and Institutions Code section 707.2[6] stated no minor could be sentenced to state prison unless he had been remanded to CYA for a diagnostic evaluation "and the court finds after having read and considered the report submitted by the Youth Authority that the minor is not a suitable subject for commitment to the Youth Authority." In *Carl B.*, the Supreme Court held a recommendation of amenability by the CYA is entitled to "great weight" (24 Cal.3d at pp. 214-215) and should be followed absent "substantial counterveiling considerations" (*id.*, at p. 215). Such counterveiling considerations did not include either the seriousness of the crime, of itself, or the fact CYA commitment might be for less time than a prison term (*id.*, at p. 219).

In 1982, however, the Legislature amended Welfare and Institutions Code section 707.2[7] deleting the language: "and the court finds after having read

---

[6]Welfare and Institutions Code section 707.2 then read: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the California Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the California Youth Authority for evaluation and report pursuant to this section and the court finds after having read and considered the report submitted by the Youth Authority that the minor is not a suitable subject for commitment to the Youth Authority."

[7]As amended, Welfare and Institutions Code section 707.2 reads: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the Youth Authority for evaluation and report pursuant to this section.

"The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall be the primary considerations in the court's determination of the appropriate disposition for the minor."

and considered the report submitted by the Youth Authority that the minor is not a suitable subject for commitment to the Youth Authority,'' and added a second paragraph stating: ''The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall be the primary considerations in the court's determination of the appropriate disposition for the minor.''

■ As amended, Welfare and Institutions Code section 707.2 specifically directs the court to consider the nature and seriousness of the offense and implicitly allows the court to consider the CYA's parole policies pursuant to the protection of society or interests of justice criteria. Moreover, the amendment also appears to alter the weight given to the CYA's recommendation of amenability since the court is no longer required to make a specific finding ''the minor is not a suitable subject for commitment to the Youth Authority,'' but rather is to consider the amenability recommendation as one of several ''primary considerations in the court's determination of the appropriate disposition of the minor.''[8]

■ Here, the CYA report noted the offense was ''planned and carried out over a period of time and shows callousness,'' but concluded Fields was amenable to treatment based on, inter alia, the instant offense was a ''drastic deviation from prior offenses,'' indications Fields had a capacity for change and a belief Fields was neither ''entrenched in a criminal life style'' nor ''criminally sophisticated.'' The report also pointed out Fields briefly escaped from juvenile hall in 1982 after breaking away from a guard, and the juvenile probation officer described Fields as a ''con artist'' and felt he was ''dangerous and his basic philosophy is to take what he wants when he wants it.''

There were four psychological examinations made of Fields. These reports noted, inter alia, Fields was ''a potentially dangerous young man'' and the loss of his basketball career ''will only act to increase his rage and make him less amenable to rehabilitation given his limited skills'' (Dr. Martin A. Magy's report of Oct. 25, 1982); ''the psychiatric data make it quite unlikely that he could be significantly rehabilitated prior to the expiration of the juvenile court's jurisdiction'' but that a CYA commitment was preferable to state prison because of the CYA's treatment programs and because state prison would probably worsen Fields' ''anti-social features'' or would result in mere ''warehousing'' (Dr. Randolph A. Read's report of Nov. 11,

---

[8]We are aware of the fact the Supreme Court has before it *People* v. *Aguilar,* Crim. No. 23869 (AO16273), see Summary of Cases Accepted 84-144 but note the issues raised are based on the now repealed section of Welfare and Institutions Code section 707.2 requiring specific findings the minor was not suitable for commitment to the Youth Authority.

1982); Fields had "signs of possible immature aggressive primitive or sadistic tendencies of repressed hostility" (Dr. Gary Abrams' report of Apr. 28, 1983); and while Fields "did appear motivated for improvement," he had failed to take full responsibility for his acts[9] and would require "close supervision" (Dr. Louis Weisberg's report of May 4, 1983). None of the reports, however, provide any support for treatment other than at CYA.

Both the initial probation report and the supplemental probation report, submitted after the CYA study, strongly recommended against a CYA commitment and in favor of a maximum prison term. The initial probation report found only two factors in mitigation—Fields' youth (Cal. Rules of Court,[10] rule 408(a)) and his early acknowledgment of wrongdoing (rule 423(b)(3))—and seven in aggravation—the cruelty, viciousness and callousness of the offense (rule 421(a)(1)), the vulnerability of the victim (rule 421(a)(3)), the premeditated nature of the offense (rule 421(a)(8)), the fact the offense was committed while Fields was on juvenile probation (rule 421(b)(4)), his prior performance on probation was unsatisfactory (rule 421(b)(5)), his crimes were of escalating seriousness (rule 408(a)), and Fields was a dangerous individual "in need of long-term incarceration and treatment for the protection of the community" (rule 408(a)). In the probation officer's opinion, the aggravating factors did not adequately "reflect the true terror experienced by the victim." While treatment is clearly needed, even long-term treatment, the probation recommendation does not provide any basis for the conclusion it must be conducted by the Department of Corrections.

The supplemental report was equally strong in its recommendation of the maximum term but without foundation.[11] The supplemental report noted the psychiatric and psychological reports refer to Fields as: ". . . a person who is antisocial, narcissistic, and likely to commit other delinquent acts. The defendant also has learning problems. He does not present the picture of an individual who has the potential to learn other ways of behavior and succeed in life without continuing to victimize others. We would also point out the defendant's juvenile record, while not lengthy, is significant, and Fields committed the instant offense while on Juvenile Probation, the day before he was to go to court for two alleged petty theft offenses. . . . Frankly, we believe that the community needs to be protected from the defendant for the maximum period of time possible."

---

[9]Fields claimed to have been on PCP at the time of the offenses. However, toxicological testing revealed no trace of PCP.

[10]All references to rules are to California Rules of Court unless otherwise specified.

[11]The strength of this recommendation is reflected by the following statement in the supplemental report: "The only mitigating thing about the offense was that the defendant did not physically torture or disfigure the victim."

The court expressed concern about the CYA's approach to release, Fields' release on the public, the viciousness of the crime, the sophistication and planning involved, and the length of time and repeated acts indicating Fields' awareness of what he was doing. *People* v. *Carl B.*, *supra*, 24 Cal.3d 212 at page 219, tells us this is not enough. "It seems apparent from our review of the record that the sentencing court failed to accord proper weight to the YA report and recommendation. Despite YA's determination that defendant would be amenable to treatment at YA, the court concluded that in view of the seriousness of defendant's offense a substantial term of prison confinement was appropriate for the protection of society. This analysis contains at least two deficiencies. First, it is based upon the unfounded premise that YA's facilities are inadequate for the training and treatment of serious offenders. Yet as we recently stated, ' "Within the Youth Authority system, there is gathered from throughout the State the most severely delinquent youths which have exhausted local programs." . . . [YA is] primarily designed for the incarceration and discipline of serious offenders.' (*In re Aline D.* (1975) 14 Cal.3d 557, 564, 567 . . . .) Thus, the seriousness of defendant's conduct, of itself, would not ordinarily constitute a legally sufficient ground to reject a YA recommendation under section 707.2. It is the YA's business to deal with serious offenders."

While the court properly considered the factors listed in Welfare and Institutions Code section 707.2, it ignores the fact CYA can provide treatment and is the recommended place for treatment. The fact the minor is amenable to treatment was uncontested by the probation department; there was, however, strenuous opposition by the probation department to a CYA commitment, but without supporting clinical or psychiatric foundation. Perhaps that can be provided by updated probation reports required after remand. We do not hold commitment to the Department of Corrections is precluded, but only there is a lack of evidence at this time to overcome the weight which must be accorded the CYA recommendation of the minor's suitability to the training and treatment it offers.

### III

Fields next contends the court improperly used the same facts to impose consecutive sentences it had already used to impose the upper term on both counts (see *People* v. *Cheeks* (1982) 135 Cal.App.3d 826, 830 [185 Cal.Rptr. 496]; *People* v. *Lawson* (1980) 107 Cal.App.3d 748, 753 [165 Cal.Rptr. 764]).

This contention is not supported by the record. Here, the trial court used the facts the offenses showed "calculated premeditation," Fields was on juvenile probation at the time of the offenses, the vulnerability of the victim

in that she was attacked in her own home, bound and gagged, and the "high degree of cruelty, viciousness and callousness" to justify the upper terms. To justify imposing consecutive sentences, the trial court used other facts—repeated sexual acts and the fact these occurred over a considerable length of time.

The court here did not improperly use the same facts to justify both the upper terms as well as consecutive sentences.

## IV

 Fields contends he is entitled to a new sentencing hearing because the trial court was unaware of its power to impose a one-third middle term consecutive sentence under section 1170.1 rather than a fully consecutive or concurrent sentence under section 667.6, subdivision (c).

The Supreme Court in *People* v. *Belmontes* (1983) 34 Cal.3d 335, at pages 345 to 346 [193 Cal.Rptr. 882, 667 P.2d 686], held courts have discretion to sentence for the forcible sex offenses listed in section 667.6, subdivision (c), under 667.6, subdivision (c), and/or under section 1170.1. If the court decides to utilize the harsher sentencing scheme of section 667.6, subdivision (c), then it must state reasons for that sentencing choice (*id.*, at pp. 347-348). The Supreme Court expressly disapproved of *People* v. *Ottombrino* (1982) 127 Cal.App.3d 574 [179 Cal.Rptr. 676], decided by this court, to the extent *Ottombrino* held the sex offenses listed in 667.6, subdivision (c) could be sentenced only in accordance with that section and not under section 1170.1 (*People* v. *Belmontes, supra,* at p. 345).

The Supreme Court also declared *Belmontes* was to have full retroactive effect since it related only to sentencing and therefore would not involve any retrials and because "[d]efendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court" (34 Cal.3d at p. 348, fn. 8). The court stated, however, no resentencing was necessary "[i]f the record demonstrates on its face that the court was aware of its statutory authority to sentence under 1170.1" or "if the record reflects that the sentencing court would not have exercised discretion to sentence under 1170.1 even if it had been aware that it had such discretion" (*ibid.*).

*Belmontes* was decided August 18, 1983, only one day before the sentencing hearing here. Therefore, it was highly unlikely the trial court had had an opportunity to read the opinion. On the face of the record, there is no indication the court was aware of the *Belmontes* decision or of its discretion to sentence under section 1170.1. Moreover, there are indications

the court might have sentenced under 1170.1 if it had been aware it had such discretion since the court began its sentencing statement by remarking, "Poor choices, what choices, but, unfortunately they were made even more difficult by what appears to be the C.Y.A. approach to release . . . ."

Because it appears the court here was unaware of its discretion to sentence under section 1170.1 and because there are indications it might have so exercised its discretion, we remand for resentencing to give the court an opportunity to exercise that discretion. If the court chooses not to sentence under section 1170.1, then it should state its reasons for choosing to sentence under the harsher provisions of section 667.6, subdivision (c).

## V

Finally, Fields contends only one knife-use enhancement should have been imposed because there was only one use of a knife.

Generally, only one weapons enhancement may be imposed when a defendant is convicted of multiple crimes arising out of a single course of conduct (*In re Culbreth* (1976) 17 Cal.3d 330, 333-334 [130 Cal.Rptr. 719, 551 P.2d 23]). After enactment of the determinate sentencing law (DSL), the Supreme Court reaffirmed the holding of *Culbreth* but noted a possible exception for enhancements for forcible sex offenses (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 913-914, fn. 9 at p. 913 [184 Cal.Rptr. 165, 647 P.2d 652]). The court cited with approval the following dicta from *People* v. *Edwards* (1981) 117 Cal.App.3d 436, at page 448 [172 Cal.Rptr. 652]: "The one exception . . . is subdivision (h) [now (i)] of Penal Code section 1170.1. . . . [¶] By adding subdivision (h) to Penal Code section 1170.1, it is clear that the Legislature intended that in regards to the specific offenses listed in subdivision (h), the number of enhancements which could be imposed could not be limited. This appears to be the only area in the DSL whereby the Legislature expressly determined or by necessary implication abrogated the single-occasion rule set forth in *Culbreth*." (See also *People* v. *Cardenas, supra,* 31 Cal.3d 897, 913, fn. 9.)

The dicta of *Cardenas* and *Edwards* has since been adopted to actually uphold multiple weapons enhancements for forcible sex offenses (*People* v. *Bergman* (1984) 154 Cal.App.3d 30, 36-37 [201 Cal.Rptr. 54]; *People* v. *Le* (1984) 154 Cal.App.3d 1, 12 [200 Cal.Rptr. 839]). We believe the reasoning of these cases is sound and therefore affirm the imposition of multiple knife-use enhancements here.

## VI

The cause is remanded to allow the court to exercise its discretion to sentence under section 1170.1 and resentence in accordance with the views expressed in this opinion, and is affirmed in all other respects.

Staniforth, J., and Wiener, J., concurred.